CUMBERLAND TELEPHONE & TELEGRAPH CO. *v.* UNITED ELECTRIC RY. Co. *et al.*

(*Circuit Court, M. D. Tennessee.* May 19, 1890.)

TELEPHONE COMPANIES—ELECTRIC RAILWAYS—INJUNCTION.
 In the present state of electrical science, a telephone company cannot maintain a bill for an injunction against the operation of an electric railway to prevent damages incidentally sustained by the escape of electricity from its rails.

(*Syllabus by the Court.*)

In Equity.   On motion for an injunction.

This was a bill in equity to enjoin the use of electricity by the street railways of Nashville under any system which makes use of the earth for its return circuit.   The complainant is a Kentucky corporation "empowered" by its charter "to construct and operate lines of telephone."   It entered the state of Tennessee, claiming a right under section 1535 of the state Code, which provides that "any person or company may construct a *telegraph* line along the public highways and streets of this state, or across the rivers, or over any lands belonging to the state, free of charge, and over the lands of private individuals as hereinafter provided, and may erect the necessary fixtures therefor."   The city of Nashville gave its consent to the use of its streets by an ordinance passed in 1879, and in that year complainant established a telephone plant, which it has continued to enlarge and improve to the present time.   In 1885 an act was passed by the legislature of Tennessee authorizing both foreign and domestic corporations to "construct, operate, and maintain such telegraph, *telephone*, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of the cities and towns of this state:   *   *   *   provided, that the ordinary use of such public highways and streets   *   *   *.   be not thereby obstructed," etc.   In 1888 the city passed another ordinance, confirming complainant's rights to the streets and alleys, as then established, and granting the further right to extend its plant as public needs might require.   Under these provisions, complainant built and operated its lines of telephone through the streets of Nashville, now having in use about 1,400 telephones, and 1,300 miles of wire.

Defendants are five street railways, all now operated by electricity, under the Sprague and Thompson-Houston systems, and using a single trolley or overhead wire.   Three of these roads were originally incorporated by special acts authorizing them to operate street railways by horse-power.   By an act approved March 21, 1887, amending the general incorporation laws, all street railways thereafter organized under the general laws of the state were authorized to propel their cars by electricity. Two of these railways were organized under the general incorporation laws.   By another act, approved February 28, 1889, all street railway companies which before that time had operated cars by animal power were empowered to operate the same by electricity, provided the city

gave its assent. Acting under this supposed authority, one of the defendants, the McGavock & Mt. Vernon Company, proceeded to equip a portion of its road with electricity.

Thereupon, and on April 17, 1889, complainant filed its bill in the chancery court to enjoin it. Before the cause was heard, the parties entered into an agreement by which the telephone company agreed to dismiss its bill, to elevate all its wires which might interfere with the operation of the road, to use all means to prevent their wires from coming in contact with the trolley wires of the road, and not to interfere further with the operation of the road; the railroad company agreeing, upon its part, to construct at its own expense a return metallic circuit, for the use of the telephone company, whenever it is ascertained that its service is being injured by electricity generated by the railway company, and to use all necessary precautions to prevent the telephone wires from coming in contact with its own wires. In January, 1890, a similar agreement was made between the telephone company and the City Electric Railway, with a proviso that if, upon a fair trial, the return wire should not protect the telephone company from substantial injury, the parties should be remitted, without prejudice, to their legal rights and remedies as they existed before the agreement was made. The bill charged that the metallic current had not given the relief anticipated, and that complainant was not estopped by its agreement. The *gravamen* of the bill was that the electricity, which is supposed to return to the dynamos by means of the iron rails, scatters through the earth, and is thereby conducted to the wires of the telephone company through various agencies, known as "conduction" or leakage, and this current, being stronger, overcomes the weaker current of the telephone, producing loud, buzzing noises, and wholly preventing, or greatly interfering with, telephonic communication. Besides, the electricity thus conducted acts upon the bells of subscribers when there is no call from the central office, causing them to ring, and also causing a great number of the annunciators at the exchange to fall at one time, so that the operators cannot tell who, if any one, has called. That, if the currents used by the cars were constant and uniform, it would not interfere with the telephones. It further averred that the service was interfered with by *induction*, where a varying current of electricity, conveyed on a conducting wire, will produce in a parallel wire other currents of electricity. The varying current upon the trolley line induces a like current in the parallel telephone wires on the same street, and also, as in the case of conduction, produces the noises and sounds, and rings the bells of subscribers, and throws down the annunciators. The bill also charged that the single trolley was dangerous to life and property. If, by winds and storms, a telephone wire should break, and fall across the trolley, it might be fatal to man or beast to touch it, and dangerous to the lives of those in the telephone exchanges, sometimes causing fire in the houses of subscribers. The bill concluded that all these troubles and dangers would be avoided if defendants would use an entire metallic circuit, or double trolley, properly constructed, and that the same result would follow if complainant

would use a complete metallic circuit for every one of its subscribers; but the latter would nearly double the cost of the plant, and grave difficulties would be encountered at the central office, which it was not certain could be successfully overcome. On the contrary, the single trolley could be converted into a double trolley at a comparatively small expense. That, in consequence of these interferences, subscribers make constant complaints, many threaten to, and some actually do, refuse to pay for their telephones.

The answer did not make an essentially different case, but averred that in February, 1889, all the defendants were sold to the United Electric Railway; that each company had sold its mules, and changed its stabling to an electric car plant; that the entire system furnishes transportation to 15,000 persons per day. It denied that the metallic return wire has failed to protect the telephone, and averred that little or no trouble was experienced on the route so protected. It further alleged that, of the four methods of equipping electric railways, viz., storage batteries, the conduit system, double trolley overhead, and single trolley overhead, all have substantially proved to be failures, except the last. It denied that the complainant was entitled to a monopoly of the earth for its return circuit, and insisted that it should make use either of a complete metallic circuit, or of a device known as the "McCluer Device" for its return circuit.

*Vertrees & Thos. H. Malone*, for complainant.

*East & Fogg, J. C. Bradford, John S. Wise*, and *John Ruhm*, for defendants.

BROWN, J. We do not care, in this case, to discuss the constitutionality of the act of 1885, or the present obligation or effect of the contract entered into between the complainant and two of the defendant railway companies, under which the latter agreed to furnish proper return wires to the telephone company in order to obviate the difficulties experienced by the escape of electricity from their rails. We prefer to assume that both these parties are lawfully exercising their franchises, and to consider their respective rights and obligations unembarrassed by any previous contracts or understandings. We see no reason to doubt the position assumed by the complainant, that a telephone company is a telegraph company, and that, under its right to construct and operate telegraphs, it was empowered to establish a telephone service. *Attorney General* v. *Telephone Co.*, 6 Q. B. Div. 244; *Telephone Co.* v. *City of Oshkosh*, 62 Wis. 32, 21 N. W. Rep. 828.

Complainant, in operating its instruments, connects each telephone with the ground by what is termed a "ground wire," through which the return current of electricity is carried to the earth, and perhaps through the earth, acting as a conductor, back to the telephone exchange. Such return, in some form or other, is necessary to the production of a current of electricity in every case. Defendants, upon the other hand, use a single overhead wire or trolley, suspended over the middle of the track, along which the electric current passes, descending by the trolley rod or

mast through the cars to the motors underneath, and thence to the rails, which are connected together at their ends, and which operate to convey the return current back to the dynamos at the power-house. The evidence, however, establishes the fact that the current does not all return by the rails. Much of it escapes, becomes scattered through the earth, ascends through the ground wires to the telephones, and seriously impairs their operation, by causing a humming or buzzing noise, which drowns the voice of the speaker, and often causes the annunciators in the exchange to fall, and the bells to give false calls, so that it is impossible for the operators to tell which, if any, of its subscribers have called, and, in short, throws the whole system into confusion.

That these evils exist, to the serious detriment of the telephone service, is not denied; but it also appears from the evidence upon both sides that they are not absolutely insurmountable. Indeed, there are but few serious questions of fact in this case, and these turn upon the relative practicability and expense of the several methods of overcoming this difficulty. In solving these questions, we are compelled to bear in mind the fact that the science of electricity is still in its experimental stage; that a device which to-day may be the best, cheapest, and most practicable, may, in another year, be superseded by something incomparably better fitted for the purpose. It is quite possible, too, that the legal obligations of the parties may change with the progress of invention, and the duty of surmounting the difficulty be thrown upon one party or the other, as a cheaper or more effectual remedy is discovered. For example, if it were shown that by the use of a certain device the defendants could control their return current in such a way as not to interfere with the use of complainant's instruments, the law might treat their failure to adopt such measures as negligence in the use of their franchise, and enjoin them, or hold them liable for all damages sustained by the complainant. If, upon the other hand, the difficulty can be better controlled by a device applicable to telephones, it might be incumbent upon the complainant to adopt it, leaving the courts to settle the further question, whether the expense of so doing is recoverable of the defendants. We are thus compelled to consider this case with reference to the present state of the art, and with the possibility, that in another year circumstances may so change as to reverse completely the legal obligations of the parties. Indeed, since the litigation between the telephone companies and the electric railway companies originally began, considerable progress has been made towards a solution of the problem. Let us consider the respective methods now suggested:

1. The double trolley. There seems to be no doubt that if defendants adopt a second trolley wire, the return current might be carried back to the dynamos without coming in contact with the earth at all, and the difficulty be completely overcome. Upon the other hand, we are satisfied from the affidavits that this would not only entail a large expense upon the defendants, but that it disfigures the streets with a complicated net-work of wires, and, wherever there are curves, turn-outs, or switches, renders the road very difficult of operation. There are two

of these double trolley roads in operation in Cincinnati; and they are used to a limited extent in other cities.   But the facts that nine-tenths of the electric railways in this country are equipped with a single trolley, and that, in most of the cities where the double trolley was formerly used, including Montgomery, Pittsburgh, Denver, Albany, and Appleton, they have been abandoned, are strong arguments against their practicability.   Indeed, it is only where the roads make use of a double track that the double trolley can be made a success.   Add to this that, in the numerous cases between the telephone companies and the electric railways which have arisen in other states, the courts have uniformly held the double trolley to be a failure as applied to single tracks, and it would seem that the question could no longer be considered an open one.

2.  There seems to be no doubt that the evil may also be remedied by a return wire attached to each telephone, by which the current is carried directly back to the exchange, instead of being dumped into the earth.   This, however, is open to the same objection as the double trolley.   It is not only very expensive, doubling the cost of the electric plant, but would double the number of wires carried through our streets, already far too numerous for comfort, beauty, or safety.   In addition to this, it involves a large outlay and increased complication and expense for the central office; there being not only two line wire terminals to provide for every subscriber, but four terminals to handle for every connection, instead of two, as with the single wire and earth systems.   Upon the whole, we deem this to be impracticable.

3.  A third device, known as the "McCluer System," remains to be considered.   This contemplates the employment of a single return wire upon each route disturbed by the railway service, to which each telephone upon that route is connected, and which operates to complete the metallic circuit.   If we are to believe the affidavits of those who are familiar with this device, it affords a perfect remedy for all disturbances produced by leakage or conduction, though there are also slight disturbances produced by induction from parallel wires, from which no complete relief has been discovered by any kind of metallic circuit, unless supplemented by the use of non-inducting cables, and the transposition of wires.   This evil, however, is remediable by increasing the distance between the parallel wires, and does not seem to be regarded as a serious matter.   It is true, defendants have produced affidavits which tend to throw some doubt upon the utility of the McCluer device, but this doubt seems to have arisen more from the reluctance of the telephone companies to adopt it than from any proven insufficiency. We think we are justified in assuming that the adoption of this device by the complainant would obviate the disturbances now produced by leakage.

The case, then, practically resolves itself into the question, at whose expense shall this change be made?   As the testimony tends to show that the introduction of the McCluer device into the telephone service of Nashville would not cost to exceed $10 to each telephone, the ques-

tion is not vital to the existence of either of these companies. At the same time, as it is one that confronts the telephone and electric railways in every city of the country where both are used, it becomes of great importance. Are the telephone companies, which have the prior right to use the streets, bound to conform their business to the demands of these new-comers, though by so doing they put themselves to large expense? Or are the railway companies bound, as a condition of occupying the same territory, to see to it that, in operating their roads, no incidental damage is done to their neighbors? If the existence of one was absolutely incompatible with the continued operation of the other, it might be incumbent upon us to make a .choice between these two great benefactions, both of which will rank among the necessities of modern urban life. But, as we are bound to assume that they can be persuaded to live together in harmony, the case virtually resolves itself into a question of liability for certain damages sustained by the complainant. In this view, it is open to serious doubt whether it is entitled to invoke the aid of a court of equity at all. Conceding that the case made by the bill is one of equitable jurisdiction, still the granting or withholding of an injunction is largely a matter of discretion, and if, upon all the pleadings and the testimony, the court can see that it involves a mere question of dollars and cents, it may well hesitate to stop the operation of these roads by resorting to the harsh remedy of an injunction, especially in view of the fact that defendants are amply able to make reparation. We do not desire, however, to dispose of the case upon this ground.

It would be perfectly competent for us to stay the issue of an injunction, as has already been done in one or two cases, until a reasonable time had elapsed for the ascertainment and payment of these damages; and, as both parties have addressed their arguments to the question of liability, we are disposed to give them the benefit of our views.

We are referred in this connection to a large number of decisions of courts of the highest respectability upon the very questions involved in this case. If these decisions had been harmonious, we should not have hesitated to defer to them; but, as these courts have reached different results, we do not feel like indicating a preference for one or the other. While all are persuasive, none are controlling; and we have deemed it more satisfactory to treat this as an original question, and inquire how far it may be answered by the application of well-settled principles.

We are asked to determine how far a person making a lawful and careful use of his own property, or of a franchise granted to him by the proper municipal authorities, is liable for damages incidentally caused to another; in other words, whether the right of the latter to an injunction does not depend upon something more than the simple fact that he has suffered injury, though his right to an undisturbed use of his own may antedate that of another. It is true that in one case, namely, *Reinhardt* v. *Mentasti*, 42 Ch. Div. 685, it is said that the principle governing the jurisdiction of the court in cases of nuisance does not depend upon the

question whether the defendant is using his own reasonably or otherwise, but upon the question, does he injure his neighbors? This case lays down a broader doctrine of liability than any to which our attention has been called, but it is sufficient to say in reply to it that nothing which is authorized by competent authority can be treated as a nuisance *per se*. *Transportation Co.* v. *Chicago*, 99 U. S. 635; *Hinchman* v. *Railroad Co.*, 17 N. J. Eq. 77; *Easton* v. *Railroad Co.*, 24 N. J. Eq. 58; *Railway Co.* v. *Heisel*, 38 Mich. 62; *Davis* v. *Mayor*, 14 N. Y. 506. We take it to be well settled, so far as persons operating under legislative grants are concerned, that something more than mere incidental damage to another must be proved—something, in fact, in the nature of an abuse of the franchise—to entitle the party injured to an injunction. It is perfectly obvious that there are a large number of instances in which a person may suffer damages without recourse to the offender. Thus, the smoke that fills our lungs, and soils our garments; the dust that enters our dwellings and stores, and damages our furniture; the noxious odors that assail our nostrils; the impure water we are sometimes compelled to drink,—are the necessary penalties we pay for living in cities; but in ordinary cases there is no legal remedy for the evil. In the somewhat flowery language of Lord Justice JAMES, in *Salvin* v. *Coal Co.*, L. R. 9 Ch. 705:

"If some picturesque haven opens its arms to invite the commerce of the world, it is not for this court to forbid the embrace, although the fruit of it should be the sights and sounds and smells of a common seaport and ship-building town, which would drive the Dryads and their masters from their ancient solitudes."

I may expend a fortune in building a handsome house 30 or 40 feet from my front fence. My neighbors upon either side may build theirs upon the line of the street, and completely ruin its market value. In the absence of a prescriptive right on my part, they may wall up my windows, and completely exclude the light, or undermine the foundation of my outer wall so that it crack and tumble down. But, if it be necessary to the beneficial enjoyment of their own property, I have no remedy. *Panton* v. *Holland*, 17 Johns. 92. There are undoubtedly a large number of cases where persons have been held liable for an infringement upon the maxim, *sic utere tuo ut alienum non lædas;* but, upon examination, they will usually be found to turn upon questions of negligence or nuisance.

1. There is no doubt that every person is bound to the exercise of reasonable care in the use of his own property; and, for any default in that particular, he will be liable to the person injured in an action for negligence. Thus, in *Vaughan* v. *Menlove*, 3 Bing. N. C. 468, defendant was held liable for negligence in building a hay-rick so near the extremity of his own land that, in consequence of its spontaneous ignition, his neighbor's house was burned, although, in *Higgins* v. *Dewey*, 107 Mass. 494, this principle was limited to cases where the burning was negligent, or might reasonably have been expected to injure the property of the neighbor. This was the real ground upon which a recovery was permitted

in the leading case of *Rylands* v. *Fletcher*, L. R. 3 H. L. 330, though the case is often cited for the broader proposition, that the person who, for his own purpose, brings on his land and collects and keeps anything there likely to do mischief if it escapes, must keep it at his peril. This case has not been accepted either in England or in this country without some qualifications. The same rule applies if a man permit a wall which had been negligently constructed to fall upon his neighbor's house, (*Gorham* v. *Gross*, 125 Mass. 232,) or a chimney to which a gas-light company had fastened a telegraph wire, (*Gray* v. *Gas-Light Co.*, 114 Mass. 149.) The principle of these cases was also applied in *Tarry* v. *Ashton*, 1 Q. B. Div. 314, where it was held to be the duty of a person hanging a lamp over the highway to keep it in good repair. This case proceeds, perhaps, as far as any in holding the defendant responsible.

To the same principle is also referable the case of *Coke Co.* v. *Vestry of St. Mary Abbott's* 15 Q. B. Div. 1, whereby the defendants were held liable for using steam-rollers, in repairing a highway, so heavy that they, injured the gas-pipes of the plaintiff. The statement of the case shows that the pipes were laid from 20 to 24 inches beneath the surface of the streets, and that this was a sufficient depth to prevent their being injured by the ordinary travel of the streets, and also by the ordinary mode of repair, if steam-rollers of great weight had not been used. The decision was put by the court upon the express ground that heavier rollers were used than were necessary; and it was said that, if "the defendants were expressly authorized by statute to use steam-rollers of such a weight as necessarily to injure the plaintiff's pipes, the plaintiffs would have no ground of complaint. The case would then be one of *damnum absque injuria.* The same consequence would follow if the defendants were expressly authorized by statute to repair in some way which necessarily required the use of heavy steam-rollers, or other machinery which could not be worked without injuring the plaintiff's pipes."

2. Similar to these are the cases in which persons have been held liable for keeping upon their land anything which operates as a nuisance to their neighbors generally, or to any particular individual. Upon this principle, if a person allows a privy to get out of repair, and the water percolates into his neighbor's cellar, (*Tenant* v. *Golding*, 1 Salk. 21; *Ball* v. *Nye*, 99 Mass. 582; *Ballard* v. *Tomlinson*, 29 Ch. Div. 115; Cooley, Torts, 568,) or maintains a mill-dam in an unsafe condition, (*Mayor* v. *Bailey*, 2 Denio, 433; *Gray* v. *Harris*, 107 Mass. 492,) or permits injurious accumulations of snow or ice upon his roof, (*Shipley* v. *Fifty Associates*, 106 Mass. 194,) or permits loud and unnecessary noises, (*Brill* v. *Flagler*, 23 Wend. 354; *Tanner* v. *Albion*, 5 Hill, 121,) or carries on a trade offensive to the neighborhood, by reason of dust, smoke, foul odors, or jar of machinery, or otherwise, (Cooley, Torts, 600, 601,) he is liable for the consequences. In all this class of cases, the question whether the carrying on of an offensive business is a nuisance or not depends very largely upon the character of the neighborhood, the time it has been carried on without objection, and the prior use of the buildings in the vi-

cinity, as a trade may be adjudged a nuisance in one place, and not in another. *Gilbert* v. *Showerman*, 23 Mich. 448; *Robinson* v. *Baugh*, 31 Mich. 290.

A leading case in the federal courts is that of *Baltimore & P. R. Co.* v. *Fifth Baptist Church*, 108 U. S. 317, 2 Sup. Ct. Rep. 719. In that case it was held that legislative authority to a railroad company to bring its tracks within the limits of the city of Washington, and to construct shops and engine-houses there, did not confer upon it authority to erect noisy workshops in the immediate vicinity of a church where services had been held several times during the week for a number of years before the erection of the shops. But, in delivering the opinion in that case, Mr. Justice FIELD drew a distinction between nuisances of that description, and a railway through the streets authorized by congress, which, when used with reasonable care, produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars, with the noises and disturbances necessarily attending their use, and affords no ground of complaint. "Whatever consequential annoyance may necessarily follow from the running of the cars on the road with reasonable care is *damnum absque injuria*."

3. There are also a few cases which indicate that, even if a man be guilty of no negligence, but is engaged in doing something dangerous in its nature, he is liable for the immediate and direct consequences of his acts. Thus, in *Hay* v. *Cohoes Co.*, 2 N. Y. 159, the defendant, a corporation engaged in digging a canal, was held liable for blasting rocks in such a way that the fragments were thrown against, and injured, plaintiff's dwelling, upon lands adjoining. It was held that it was liable although no negligence or want of skill was alleged or proved. The doctrine laid down in this case, however, was carefully limited in the subsequent case of *Losee* v. *Buchanan*, 51 N. Y. 476, in which the owner of a steam-boiler was held not to be liable for damages occasioned by its explosion, in the absence of proof of fault or negligence on his part; and it was said that the defendant was held liable in the *Cohoes Case* upon the ground that its acts in casting the rocks upon the plaintiff's premises were direct and immediate. In the same line is the case of *Cahill* v. *Eastman*, 18 Minn. 324, (Gil. 292,) in which the defendants were held liable for the consequences of an ordinary spring freshet, without proof of negligence or unskillfulness on their part in the construction and maintenance of a tunnel through which water flowed and damaged the plaintiff's mill. Defendants' liability was put upon the ground that the damages the plaintiff sustained were the direct and immediate result of the defendants' operations on their own land. "The plaintiffs had a right to hold their property free of such a result of the defendants' use of their land." The authorities are carefully collated, and the opinion is a very instructive one. These cases would be apposite, if the defendants had found it necessary, in the construction of their line, to cut the wires of the telephone company, remove its posts, or commit any other direct depredation upon its property.

4. Subject to these exceptions, we understand the law to be well settled that no person is liable for damages incidentally occasioned to another by the necessary and beneficial use of his own property, or of a franchise granted to him by the state. The principle is thus stated by Judge WOODWORTH in *Panton v. Holland*, 17 Johns. 92–99:

"On reviewing the cases, I am of opinion that no man is answerable in damages for the reasonable exercise of a right, when it is accompanied by a cautious regard for the rights of others, when there is no just ground for the charge of negligence or unskillfulness, and when the act is not done maliciously."

Illustrations of this principle are plentifully scattered through the reports. It extends not merely to the digging up of ground for a new building, whereby the walls of the next house are injured, (*Panton v. Holland*, 17 Johns. 92–99; *Thurston v. Hancock*, 12 Mass. 220,) but to the burning of fallow land, whereby fire is communicated to adjoining lands, (*Clark v. Foot*, 8 Johns. 329,) to the erection of a mill-dam, whereby water is in part diverted from a lower mill, (*Platt v. Johnson*, 15 Johns. 213,) to the building of a basin or bridge, whereby access to plaintiff's dock is obstructed, (*Lansing v. Smith*, 8 Cow. 148, 4 Wend. 9; *Gilman v. Philadelphia*, 3 Wall. 713,) and even to the pollution of a stream by the discharge of tan-bark from an upper mill, which was suffered to float down upon the mill of the plaintiff, where it was shown to have been the uniform custom of the country to permit it, (*Snow v. Parsons*, 28 Vt. 459.) A distinction is drawn between cases where the pollution of a stream is indispensable to its beneficial use, and cases where the pollution is such as to make it absolutely useless to manufacturers lower down the river. Of the latter class is *Merrifield v. Lombard*, 13 Allen, 16, where the defendant threw vitriol and other noxious substances into the stream a short distance above plaintiff's factory, by means of which the water was corrupted so that it corroded plaintiff's engine and boiler, and rendered them unfit for use. In such cases the court will weigh the circumstances and necessities of the case, and the manner in which the stream has heretofore been used. Cooley, Torts, 587. In the case of *Coal Co. v. Sanderson*, 113 Pa. St. 126, 6 Atl. Rep. 453, it was held that one operating a coal mine in the ordinary and usual manner may drain or pump water upon his own lands, which percolates into the stream which forms the natural drainage of the basin in which the mine was situated, although the quantity of water may thereby be increased, and its quality so affected as to render it totally unfit for domestic purposes by the lower riparian owners. It was intimated that the use and enjoyment of a stream of pure water for domestic purposes must, from the necessity of the case, give way to the interests of the communities, in order to permit the development of the natural resources of the country, and to make possible the prosecution of the lawful business of mining coal. It is said, in the opinion of the court, to be "a general proposition, that every man has the right to the natural use and enjoyment of his own property; and if, whilst lawfully

in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria;* for the rightful use of one's own land may cause damage to another, without any legal wrong."

The same principle is applicable to the case of a public officer, who, if authorized by law to excavate earth in grading a street, or constructing a tunnel, will not be responsible, in the absence of negligence, for damage to abutting property owners. *Smith* v. *Washington Corp.*, 20 How. 135; *Transportation Co.* v. *Chicago*, 99 U. S. 635; *Callender* v. *Marsh*, 1 Pick. 418; *Radcliff's Ex'rs* v. *Mayor*, 4 N. Y. 195. In this last case, it is said that an act done under lawful authority, if done in a proper manner, can never subject the party to an action, whatever consequences may follow. The case of *McCombs* v. *Akron*, 15 Ohio, 474, in which it was held that a corporation was liable for injuries to plaintiff's property in cutting down and grading a street, is opposed to the great weight of authority, and in a number of cases has been denied to be law. See, also, *Chapman* v. *Railroad Co.*, 10 Barb. 360. In *Steel Co.* v. *Kenyon*, 6 Ch. Div. 773, it is said, with regard to the storage of water upon defendant's land, that is was necessary for the plaintiff to show, not only that he had sustained damage, but that the defendant had caused it, by going beyond what was necessary in order to enable him to have the natural use of his own land. In *Attorney General* v. *Asylum*, L. R. 4 Ch. 146, defendant was held liable for polluting a stream by its sewage, upon the ground that the evil might have been remedied by depositing the sewage elsewhere. Other instances of serious damage, suffered without the possibility of recourse, may occur whenever a rival bridge is authorized to be built across a stream, as was done in *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420. The building of a new railroad may destroy the value of a turnpike, of a line of coaches, of taverns, public houses, and even of small towns lying along its line. Illustrations are found in *Boulton* v. *Crowther*, 2 Barn. & C. 703; and *Nichols* v. *Marsland*, L. R. 10 Exch. 255.

In *Rockwood* v. *Wilson*, 11 Cush. 226, it is said that "nothing can be better settled than that, if one do a lawful act upon his own premises, he cannot be held responsible for injurious consequences that may result from it, unless it was so done as to constitute actionable negligence." What shall be considered indirect, as distinguished from direct, injuries, is clearly stated in *Railroad Co.* v. *Marchant*, 119 Pa. St. 541, 13 Atl. Rep. 690, in which a construction was given to a constitutional provision of Pennsylvania securing just compensation by corporations for property "injured or destroyed," as well as "taken." It was held to be confined to such injuries to one's property as are actual, positive, and visible,— the natural and necessary results of the original construction or enlargement of its works by a corporation, and of such certain character that compensation therefor may be ascertained at the time the works are being constructed or enlarged, and paid or secured in advance, as distinguished from indirect injuries to the plaintiff, which were the result merely of a

subsequent operation of its railroad in lawful manner, without negligence, unskillfulness, or malice.

The substance of all the cases we have met with in our examination of this question—and we have cited but a small fraction of them—is that, where a person is making lawful use of his own property, or of a public franchise, in such a manner as to occasion injury to another, the question of his liability will depend upon the fact whether he has made use of the means which, in the progress of science and improvement, have been shown by experience to be the best; but he is not bound to experiment with recent inventions, not generally known, or to adopt expensive devices, when it lies in the power of the person injured to make use himself of an effective and inexpensive method of prevention. *Hoyt* v. *Jeffers*, 30 Mich. 181. If, in the case under consideration, it were shown that the double trolley would obviate the injury to complainant without exposing defendants or the public to any great inconvenience or a large expense, we think it would be their duty to make use of it, and should have no doubt of our power to aid the complainant by an injunction; but, as the proofs show that a more effectual and less objectionable and expensive remedy is open to the complainant, we think the obligation is upon the telephone company to adopt it, and that defendants are not bound to indemnify it; in other words, that the damage incidentally done to the complainant is not such as is justly chargeable to the defendants.   Unless we are to hold that the telephone company has a monopoly of the use of the earth, and of all the earth within the city of Nashville, for its feeble current, not only as against the defendants, but as against all forms of electrical energy which, in the progress of science and invention, may hereafter require its use, we do not see how this bill can be maintained.   We place our denial of an injunction upon the grounds:

1. That the defendants are making lawful use of the franchise conferred upon them by the state, in a manner contemplated by the statute, and that such act cannot be considered as a nuisance in itself.

2. That, in the exercise of such franchise, no negligence has been shown, and no wanton or unnecessary disregard of the rights of the complainant.

3. That the damages occasioned to the complainant are not the direct consequence of the construction of the defendants' roads, but are incidental damages resulting from their operation, and are not recoverable.

The cases involving this principle are almost innumerable; and in our examination of them we are satisfied the great weight of authority bears in the direction we have indicated.   As a result, the motion for an injunction must be denied.