(No. 34915.—

CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Appellee, *vs.* ILLINOIS COMMERCE COMMISSION *ex rel.* Illinois Central Railroad Company, Appellant.

*Opinion filed January 22, 1960—Rehearing denied March 28, 1960.*

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and HARRY R. BEGLEY, Special Assistant Attorney General, of Chicago, (ELMER M. WALSH, JR., of counsel,) for the Illinois Commerce Commission.

JOHN W. FOSTER, ROBERT MITTEN, and CRAIG & CRAIG, all of Chicago, (JOSEPH H. WRIGHT, and HERBERT J. DEANY, of counsel,) for appellant.

BAKER & BAKER, of Shelbyville, and STEVENS, HERNDON & NAFZIGER, of Springfield, for appellee.

Mr. JUSTICE DAVIS delivered the opinion of the court:

This case involves the jurisdiction of the Illinois Commerce Commission, herein called the Commission, to compel Central Illinois Public Service Company, herein called the Power Company, to contribute to the cost of changing the train-stop system of the Illinois Central Railroad Company, herein called the Railroad.

In 1953 the Railroad filed a complaint with the Commission alleging that the Power Company had allowed current to escape from its transmission lines which interfered with the train-stop system of the Railroad and caused false signals that endangered public safety. The complaint

prayed that the Power Company take the necessary steps to correct the interference at its cost. The Power Company answered, denying responsibility for the interference and challenging the jurisdiction of the Commission.

After extensive hearings the Commission found that current escaping from the Power Company transmission lines interfered with the train-stop system of the Railroad, creating a serious hazard to the public; that, since the cost of correcting the Power Company's facilities would be excessively high, the best engineering solution would be to require a conversion of the Railroad's train-stop system from 60-cycle to 100-cycle current, thereby immunizing it from interference, and to require the Power Company to supply 100-cycle current to the Railroad; that the change would require the joint action of the utilities; and that its cost should be borne jointly by them.

The Railroad and Power companies were given 30 days to agree on an apportionment of such costs, but they were unable to do so. The Commission then held further hearings upon which it affirmed its prior order and found that, since the Power Company had not made 100-cycle current available, the Railroad should perform all the work and provide the necessary conversion equipment. The Commission ordered that the Railroad and Power companies each bear 50 per cent of the cost of the conversion.

Rehearing was denied, and the Power Company appealed to the circuit court of Shelby County, which held that the order was beyond the jurisdiction of the Commission and set it aside. The Railroad and the Commission perfected a direct appeal to this court pursuant to section 69 of the Public Utilities Act. Ill. Rev. Stat. 1957, chap. 111⅔, par. 73.

The record contains voluminous testimony and numerous exhibits which are technical and complex, but fortunately a brief summary of the evidence is sufficient to illuminate the legal issues involved.

In 1922 the Interstate Commerce Commission ordered the Railroad and certain other railroads throughout the United States to install automatic train-stop or train-control devices. Pursuant to that directive, the Railroad conducted tests and determined that the proper facility would be the continuous automatic train-stop system, which was installed in January, 1926, and operated between Champaign and Branch Junction, Illinois, a distance of 121.8 miles. The track rails were utilized to carry the electrical current necessary to operate both the track circuits and the train-stop equipment on the engines.

The transmission lines of the Power Company paralleled and at points crossed over this line of double tracks of the Railroad. The train-stop system was installed to operate on 60 cycles alternating current, the frequency which was being supplied by the Power Company. In fact, it was questioned whether the Railroad could have then installed a 100-cycle system since the Power Company could not have furnished adequate three-phase service.

Prior to its installation, tests were conducted for over a year to see if there was any foreign current which would interfere with the 60-cycle system and none was detected. Twenty-two years after the installation, foreign current first began to affect the train-stop system and continued with increased intensity through 1953. Such foreign current in the system caused false signals—a green light would appear when a red light should show and *vice versa*. Joint tests conducted by the Railroad and the Power Company during 1952 and 1953 showed that when the lines of the Power Company were de-energized, all foreign current in the track disappeared.

At the time of the hearing before the Commission, the Railroad operated 12 regular passenger trains, 32 freight trains and numerous special unscheduled trains over the tracks in question, and in 1952, it carried over 800,000 passengers over such tracks. Its passenger trains travelled

at a maximum speed of 100 miles per hour, while its freight trains operated at 50 to 60 miles per hour. The most dangerous aspect of false signals is that they are more frequent during wet and foggy weather which is the time when true signals are of paramount importance.

During the period from 1926 to 1953, the Power Company changed, extended and enlarged its transmission lines more than 20 times, both with and without Commission approval. The length of such lines, parallel to the Railroad, was increased from 61 to 113.5 miles, and the intensity of the load carried, from 125 million to 1 billion 540 million KWH, an increase of 1,132%. Part of this construction was multi-grounded and part uni-grounded, while in some instances "Y" circuits and delta circuits were used.

The elimination of the foreign current from the transmission lines of the Power Company could be accomplished by converting all the multi-grounded lines to a delta type of circuit. Also, the interference could be eliminated by (a) moving the power lines away from the Railroad, (b) employing adequate transposition, (c) reducing the loads on given power lines and building additional lines to handle increased need for power, (d) use of ungrounded multi-conductor cable instead of open wire, and (e) installing larger wires containing more copper on existing lines. However, the cost of changing the Power Company facilities would amount to millions of dollars.

The witnesses for the Power Company all stated that the only practical solution was to convert the Railroad's train-stop system from 60 to 100 cycles which would eliminate the false signals at far less expense than that involved under any other suggested procedure. While it was first estimated that the conversion would cost $170,000, the revised cost estimates after the work began were $142,784.

The Power Company contends that the Railroad cannot recover the cost of changing its train-stop system in the absence of evidence that the Power Company has been

negligent. It further urges that the jurisdiction of the Interstate Commerce Commission is exclusive over the Railroad's train-stop system and therefore the Commission cannot compel the Power Company to pay a part of the cost of such conversion.

The Railroad and the Commission rely on the power granted the Commission, under the Illinois Public Utilities Act, to enter such orders as are necessary to promote and safeguard the security and safety of the public, and contend that this power has not been taken away by any Federal act.

At the outset we conclude, and it is apparently conceded, that current emanating from the Power Company's transmission lines is causing such interference with the Railroad's train-stop system as to constitute a serious hazard to public safety. However, the Power Company has maintained its transmission lines in accordance with the rules and regulations of the Commission and without negligence and it therefore syllogizes that, in the absence of actionable negligence, the Commission cannot force it to pay part of the cost of the conversion of the train-stop system.

This argument misconceives the nature of the proceeding. It is not in any sense a common-law action for damages. We have carefully examined the cases cited by the Power Company and find that they all involve either common-law actions sounding in damages or suits in equity wherein an injunction was sought for wrongful interference with the use of the plaintiff's property. *Eastern and South African Telegraph Co.* v. *Cape Town Tramways Cos.* 2 B.R.C. 114; *Lake Shore & Michigan Southern Railway Co.* v. *Chicago, Lake Shore & South Bend Railway Co.* 48 Ind. App. 584, 92 N.E. 989; *Southwestern Public Service Co.* v. *Moore,* 119 Texas 391, 29 S.W.2d 329; *Phillippay* v. *Pacific Power & Light Co.* 120 Wash. 581, 207 Pac. 957; *Cumberland Telephone & Telegraph Co.* v.

*United Electric Railway Co.* 42 Fed. 273; *Georgia Power Co.* v. *Parker,* 48 Ga. App. 807, 173 S.E. 730.

In this controversy, we need not decide whether the Railroad has a cause of action against the Power Company for damages to its facilities or property. This is a special statutory proceeding instituted by the Railroad pursuant to section 64 of the Public Utilities Act. ( Ill. Rev. Stat. 1957, chap. 111⅔, par. 68.) The Commission had jurisdiction over both the Power Company and the Railroad as public utilities within the meaning of section 10.3 of the act. (Ill. Rev. Stat. 1957, chap. 111⅔, par. 10.3.) As such public utilities deriving their franchises from the State, both must submit to the burdens, conditions and regulations imposed by the State pursuant to its police power to protect the safety and the security of the public. *Chicago and Northwestern Railway Co.* v. *Commerce Com.* 326 Ill. 625.

Sections 32, 49, 50, and 57 of the act, (Ill. Rev. Stat. 1957, chap. 111⅔, pars. 32, 49, 50, and 61,) provide in the most comprehensive terms, that the Commission shall have the power to require changes, additions and improvements in connection with the facilities of existing public utilities to promote the security and safety of its employees and the public. *Brotherhood of Railroad Trainmen* v. *Elgin, Joliet and Eastern Railway Co.* 382 Ill. 55; *Chicago, Burlington and Quincy Railroad Co.* v. *Commerce Com. ex rel. Brotherhood of Railroad Trainmen,* 364 Ill. 213; *Chicago Motor Coach Co.* v. *City of Chicago,* 337 Ill. 200; *Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 Ill. 425.

The authority for the exercise of jurisdiction over the Power Company is not that it has acted negligently or with malice. Rather the power of the Commission arises from the fact that the exercise of the Power Company's franchise by the transmission of current in close proximity to the Railroad's tracks has created a condition which caused the existence of false signals and such signals con-

stitute a hazard to the safety of the public and the employees of the Railroad. Such condition gives rise to power and jurisdiction in the Commission without regard to fault on the part of either public utility.

This distinction, as pointed out by a California case, is especially applicable here. In *Postal Telegraph-Cable Co. v. Railroad Com.* 197 Cal. 426, 241 Pac. 81, the California Commission found that the transmission lines of a power company created inductive disturbances to the telegraph lines of the petitioner, Postal Telegraph, and acting under statutory language almost identical to that of section 50 of our act (Cf. Cal. Stat. 1951, chap. 764, par. 762, and Ill. Rev. Stat. 1957, chap. 111⅔, par. 50,) ordered the petitioner to relocate its lines and apportioned the cost at 50% to each utility. Upon appeal, the Supreme Court of California affirmed.

In answering contentions substantially the same as those advanced by the Power Company here, the California court stated, at pages 85-86:

"We are not here concerned with any monetary damages which may have accrued to petitioner against the power company because of the negligent or improper construction or maintenance of its circuit system. The commission did not have jurisdiction to adjudicate such an issue. The question germane to the commission's duty was whether the two companies could exist in their present location and perform public services under grant of the laws of the state with due regard to public efficiency and the safety of person and property. The commission undertook to exercise its power upon complaint by the petitioner in accordance with the provisions of section 36, Public Utilities Act. * * * Another reason which moved the commission to make its order directing the relocation of a portion of petitioner's line was that the cost of relocating the power lines was estimated approximately at $120,000. whereas the cost of relocating petitioner's was estimated

at about $22,000. This of itself was a legitimate matter for the consideration of the commission.

"Much law has been written, and many divergent opinions expressed, upon the question as to whether or not the first grantee of a franchise has superior rights over a junior licensee, and whether, so long as the first licensee is not disturbed in its occupancy, it must submit to such unavoidable inconveniences as may result from a reasonable and fair exercise of the junior licensee's franchise, and whether damages which are merely a natural incident to and the direct and immediate result of the junior licensee's operations are actionable, and will be enjoined. * * * We do not think the commission was called upon to decide upon which side of these momentous questions the weight of authority is to be found. It was not created merely to act as an arbiter of disputes between private electric companies, but to promote the public interest and safety generally. In making its order the commission was acting within the limits of the police power of the state, and, as neither company has a vested right to remain where it was located as against the public's welfare, safety, and convenience, its order directing a greater horizontal separation of two dangerous agencies was properly made.

"We entertain no doubt but that the authority of the commission extends to a correction of just such dangers as were shown to exist in the instant case. No one would dispute the right of the commission to require a separation of two railroad tracks built so closely together as to endanger the safety of passengers and the general public or its power to order a wider separation of two high-power electric lines so close in parallel as to be an admitted menace to life and limb. The difference between the instanced cases and the instant case is in degree only.

"Said public utilities having failed to agree upon a division of the costs of the removal or relation of a fractional portion of petitioner's telegraph line, and the cost

thereof being a joint charge against both within the provisions of section 36, Public Utilities Act, and the commission having fixed the proportion of the cost to be borne by each at one-half of the total cost of said change, and inasmuch as it cannot be said that the commission acted arbitrarily or oppressively in the premises, its order must be affirmed, even if it should appear to us that the apportionment of costs in favor of the petitioner was not as large as we might have allowed, were we vested with jurisdiction to fix the amount."

Subsequent to this decision the telegraph company brought suit against the power company for prior damages suffered, but the Supreme Court of California rejected the claim and pointed out that a common-law action for damages was not grounded upon the same facts which would sustain an exercise of regulatory power by the commission. *Postal Telegraph-Cable Co. v. Pacific Gas & Electric Co.* 202 Cal. 382, 260 Pac. 1101.

The record in the case at bar clearly shows that the exercise of the respective franchises of the two utilities constitutes an extreme hazard to the public. We find no substantial evidence that this hazard arose from the negligence or malice of either utility. Nevertheless it was the duty of the Commission to protect the public safety regardless of the negligence or care of the utilities involved.

If this could have been accomplished at reasonable cost by a relocation of the Power Company transmission lines, we have no doubt concerning the power of the Commission to order such relocation under section 49 of the act. But the Commission properly considered that the public must ultimately bear the burden of the cost of such relocation by reason of a change in the rate structure of the utility. It was conceded by all witnesses before the Commission that the most economically feasible solution to this hazard to public safety would be a conversion of the train-stop system to 100-cycle current.

The Commission therefore ordered this conversion by joint action of the utilities and apportioned the cost equally between them pursuant to section 50. We have examined the record and cannot say that the order of the Commission apportioning such cost is arbitrary, unreasonable, or against the manifest weight of the evidence. Therefore, it cannot be set aside on such grounds. *Illinois Central Railroad Co.* v. *Franklin County,* 387 Ill. 301; *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31.

We next consider the Power Company's contention that the Commission was totally without jurisdiction to order it to pay a portion of the cost of changing the Railroad's automatic train-stop system, because the Interstate Commerce Commission had exclusive jurisdiction over such system. Section 26 of the Interstate Commerce Act, (U.S.C., Title 49, sec. 26,) does vest the Interstate Commerce Commission with broad power to order railroad carriers to install and maintain automatic train-stop systems which comply with the specifications and requirements of the Interstate Commerce Commission. The train-stop system of the Railroad in the case at bar was installed and approved pursuant to orders of the Interstate Commerce Commission. 69 I.C.C. 258, and 115 I.C.C. 270.

There is some doubt whether the Railroad could have installed a 100-cycle system at that time, but the 60-cycle system was then cheaper and satisfactory. From this record it appears that the change from 60 to 100-cycle current would have no effect on the operation of the system other than to substantially reduce the susceptibility of the system to foreign current. Such conversion will not violate any order or regulation of the Interstate Commerce Commission.

It is clear that State action affecting interstate commerce is precluded in three types of situations: (1) where State action directly burdens interstate commerce; (2) where State action conflicts with Federal regulations; and (3) where Congress has evidenced an intent to completely

pre-empt the area of regulation involved. *Kelly* v. *Washington ex rel. Foss Co.* 302 U.S. 1, 82 L. ed. 3; *Pennsylvania Railroad Co.* v. *Department of Public Utilities,* 14 N.J. 411, 102 A.2d 618.

It is apparent that the present exercise of the police power by the Commission neither burdens interstate commerce nor conflicts with any Federal act or regulation. However, the Power Company insists that Congress has so far occupied the field of train-stop regulation that any action by a State in that area is precluded, and cites *Napier* v. *Atlantic Coast Line Railroad Co.* 272 U.S. 605, 71 L. ed. 432, in support of its contention. Nevertheless it was held in *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U.S. 761, 89 L. ed. 1915, that this specific portion of the Interstate Commerce Act did not preclude all State regulation under the police power. The Supreme Court stated at 89 L. ed. 1922: "Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless its purpose to do so is clearly manifested, [citations], or unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly and palpably infringes its policy." Also see *Kelly* v. *Washington,* 302 U.S. 1, 82 L. ed. 3.

In the present case we are not called upon to determine the extent to which the Commission could supplement or add to the Federal requirements for train-stop systems. We need only decide whether the Commission can choose the most economically feasible manner of eliminating a grave hazard to the people of this State, when such a choice requires action that is clearly permissible under Federal law. We find in the Interstate Commerce Act no intention to preclude such an exercise of the police power.

In essence the Commission has found a grave hazard to public safety existed by reason of foreign current escap-

ing from the Power Company transmission lines. The Commission could solve this problem by exercising its undoubted jurisdiction over the facilities of the Power Company, but the cost of moving the power lines away from the tracks of the Railroad would be excessively high and would place an undue burden on its customers by an ultimate increase in its rate base. The Railroad could, and has, converted its facilities at far less cost, and in a manner thoroughly compatible with Federal law. We can see no invasion of a Federally pre-empted area by this action.

By reason of the foregoing conclusions, the judgment of the trial court setting aside the orders of the Commission must be reversed, and the orders of the commission are confirmed.

*Judgment reversed;*
*orders of commission confirmed.*