PEORIA WATERWORKS CO. v. PEORIA RY. CO.

(Circuit Court, N. D. Illinois, E. D. September 30, 1910.)

No. 24,193.

1. ELECTRICITY (§ 9*)—INJURIES INCIDENT—SCOPE OF INJUNCTION.

A court of equity has no power to prescribe by injunction the use by an electric street railway company of any particular system of circuit or negative return, even though it is shown that the system in use results in the continuous injury, and will result in the destruction by electrolysis by its return current of the pipes of a water company, but the utmost possible relief which the court can grant is to restrain the continuance of the injury, and punish the company and its officers for contempt in case of disobedience, leaving the means to be adopted to cure and prevent the injury entirely to its discretion.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 9.*]

2. ELECTRICITY (§ 9*)—INJURY TO PIPES OF WATER COMPANY BY ELECTROLYSIS —INJUNCTION—MEASURE OF RELIEF.

In a suit by a water company against an electric street railway company to enjoin defendant from injuring the mains and service pipes of complainant by electrolysis caused by electricity generated by defendant, the evidence showed that both parties used in part the same streets under franchises granted by the city; that defendant operated its line by the single trolley system using the rails as return conductors; that complainants' pipes were being injured by electricity which passed to them from the rails through the earth, but not to the serious extent claimed, and that the injury was being lessened by means adopted by defendant by the use of brazed rail bonds and by feeder wires from the rails to the negative side of the dynamos. The weight of the expert testimony also tended to show that, while the escape of electricity from the rails to the water pipes and consequent injury to the latter by electrolysis could not be entirely prevented in the system used by defendant, it could be so lessened by the means defendant was adopting or other means suggested and used elsewhere as to practically prevent serious injury to the pipes of complainant. Held, that it was the legal duty of defendant to prevent such injury by all reasonable and practical means; that it would be enjoined from continuing such injury, but would be left free to adopt within a reasonable time such means to that end as it should be advised.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 9.*]

3. WORDS AND PHRASES—"C. G. S. SYSTEM"—"CENTIMETER-GRAM-SECOND SYSTEM."

Units of electrical force and volume have been fixed by law with reference to what is known as the centimeter-gram-second system, generally referred to as the "C. G. S. system." This system was adopted with reference to length, expressed by the centimeter, mass, expressed by the gram, and time, expressed by the second. These are the fundamental units of scientific work.

4. WORDS AND PHRASES—"UNIT OF FORCE."

The unit of force, in scientific work, is that force which, when acting on a body weighing one gram, will give it an acceleration of one centimeter in one second.

5. WORDS AND PHRASES—"OHM"—"UNIT OF RESISTANCE."

The unit of resistance, called the "ohm," is 1,000,000,000 units of the C. G. S. system.

6. WORDS AND PHRASES—"UNIT OF VOLUME"—"AMPERE."

The unit of volume, called the "ampere," is one-tenth unit of the C. G. S. system.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. WORDS AND PHRASES—"UNIT OF PRESSURE"—"VOLT."

The unit of pressure, called the "volt," is that electrical force which when steadily applied to a wire or other conductor having a resistance of 1,000,000,000 units of the C. G. S. system will produce a current of one-tenth of a unit per second of that system.

8. WORDS AND PHRASES—"UNIT OF POWER"—"WATT"—"HORSE POWER."

The unit of power, called the "watt," equals 10,000,000 units of power in the C. G. S. system, or one ampere times one volt. One horse power is 746 watts or ¾ kilowatts.

9. WORDS AND PHRASES—"ELECTROLYSIS"—"ELECTROLYTE."

"Electrolysis" is the decomposition of a metal solution in water, liquid ammonia, etc., accompanied by decomposition of the water into oxygen and hydrogen, or of a mass of molten metal, by having an electric current passed through it. The solution or melted mass is known as an "electrolyte."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, p. 2343.]

In Equity. Suit by the Peoria Waterworks Company against the Peoria Railway Company, successor to the Central Railway Company. Decree for complainant.

John S. Stevens, John J. Herrick, and William T. Abbott, for complainant.

I. C. Pinkney and John P. Wilson, for defendant.

SANBORN, District Judge. Bill for injunction against injury to water mains by electrolysis. The case was twice referred to Mr. Wean as special master. His findings of facts and legal conclusions on both references, filed April 30, 1910, follow:

"(I) On the 8th day of January, 1894, the Atlantic Trust Company of New York filed a bill in the United States Circuit Court for the Northern District of Illinois, Southern Division, to foreclose a mortgage of the Peoria Water Company, a corporation of the state of Illinois, upon the waterworks system and plant of said company in Peoria, Ill., securing outstanding bonds of the company, which suit was duly removed to the Northern Division of said District. On the 8th day of January, 1894, Cornelius B. Gold of New York was appointed receiver in said cause, and on the 20th day of July, 1897, a decree of foreclosure and sale was entered by this honorable court, in and by which decree a special master in chancery was appointed and directed to make sale of the property of said defendant on terms mentioned in said decree, provided the amount found in said decree to be due from the said defendant should not be paid as in said decree provided. In accordance with the provisions of said decree, the said property was by the special master offered for sale on the 14th day of January, 1898, and on that day was struck off to William D. Barbour, Edward Oothout, and Herbert C. Warren, constituting the authorized committee of the holders of the bonds of said defendant Peoria Water Company. The said William D. Barbour and Edward Oothout were at that time and at the time of the filing of the petition of the receiver herein both citizens of the state of New York, and the said Herbert C. Warren was at said times a citizen of the state of Connecticut. On March 4, 1898, the special master filed a preliminary report of his proceedings up to that date, which were approved and confirmed by order of this court, but at that time payment had not been completed by the purchasers, the deed had not been delivered, the property had not been surrendered. The decree of foreclosure specifically provided that the receiver should remain in possession of the mortgaged property, and continue to operate the same after the sale and until the surrender thereof. While affairs were in this condition, and on the 21st day of March,

1898, the said Cornelius B. Gold, receiver, presented his petition, in which it was alleged that the railway companies therein named were destroying the plant and property in his custody as receiver by electrolysis; the prayer of said petition being for an injunction operative after a reasonable limit of time against the further operation of electric cars until the defendants have made use of such appliances as will prevent the grounding of electric currents and their coming in contact with the pipes and mains of the waterworks system. The petition recited that the receiver was a resident and citizen of the state of New York. It recited the sale to the members of the bondholders' committee, and that the petition was filed not only on the receiver's behalf for the protection of his possession and custody as receiver, but for the use of the purchasers, their successors, and assigns, and that the said purchasers were citizens of other states than the state of Illinois. On the same day the petition was filed a rule to show cause was entered by the court, and service of the same was made upon the defendants on the 26th day of March, 1898, as appears by the return of the United States marshal now on file in the office of the clerk of this court. On the 11th day of April, 1898, the defendant railway companies answered the petition upon the merits, but alleged in such answer that at the time of the filing of the receiver's petition aforesaid the title, custody, and control of said property had become divested in this court and in the said receiver, and had passed to the purchasers at the sale of said property, and that this court by reason of such sale and transfer of title to said property had no further interest in the protection of the same, that the said receiver had no further right or authority to act as receiver of this court in connection therewith, and that any adjudication made by this court of the questions and matters complained of by said Gold, as receiver, 'in his bill of complaint herein,' would not be binding upon the real parties in interest or the owners of the said property. Subsequent to the filing of the answers above mentioned, the purchasers hereinbefore named complied with their bid by surrendering the old bonds and coupons, and assigned their interest to the Peoria Waterworks Company, a corporation organized under the laws of New Jersey. At the request of the purchasers, a deed was made to their assignee, the Peoria Waterworks Company, by the said special master, which deed is dated the 13th day of July, 1898, and was filed in the Recorder's Office of Peoria County, Illinois, on the 5th day of August, 1898. After the delivery of this deed, the special master again reported his doings to the court in a report filed the 4th day of August, 1898. On the 4th day of August, 1898, the court entered an order confirming the report last above mentioned, in and by which order there was set forth the pendency of the proceeding against the railway companies, and the discharge of the receiver was ordered to be without prejudice to such suit. By order of court made on the same day, the Peoria Waterworks Company, a corporation of New Jersey, then the owner of the property, was, by amendment, substituted for the receiver, as complainant in said petition, and thereafter, as hereinabove stated, evidence was taken by agreement of the parties in the cities of Peoria and Chicago, Ill., Cincinnati, Ohio, New York City, Brooklyn, and Albany, N. Y., Philadelphia and Pittsburg, Pa., Milwaukee, Wis., and Terre Haute, Ind. On August 26, 1899, by consent, there was filed an amendment to the said petition, and on the 17th day of October, 1899, by consent of parties, an amendment was filed to the answer of the Central Railway Company and the Peoria & Prospect Heights Railway Company, which amendment relates wholly to the merits of the case made by said petition as amended.

"(2) The Peoria Waterworks Company, complainant as aforesaid, is the owner of an 'improved, enlarged, and extended' system of waterworks in the city of Peoria, Ill., which system includes about 85 miles of mains and 5,000 service pipes, and is operating the same under an ordinance passed by the common council of the city of Peoria on the 4th day of May, 1889, and amended on the 23d day of July, 1889, and the 5th day of August, 1890. The preamble of said ordinance is as follows: 'An ordinance, for an improved, enlarged and extended system of waterworks, for the city of Peoria, Illinois, and its inhabitants, and to supply them with water for all public and private purposes, and to sell to John G. Moffett, Henry C. Hodgkins, John V. Clarke, and Charles T. Moffett, doing business under the firm name of Moffett, Hodgkins

& Clarke, of Watertown, New York, the present existing system of water-works of the city of Peoria, as an entirety, and granting to the said Moffett, Hodgkins & Clarke, the franchise and license to rebuild, enlarge and extend the present system of waterworks, and to construct, maintain and operate as a whole, the new, improved, enlarged and extended system of waterworks, in, near and for the said city of Peoria, and contracting with the said Moffett, Hodgkins & Clarke for water for fire protection and other public uses for the city of Peoria, and granting to the said Moffett, Hodgkins & Clarke the right and license to furnish, deliver and sell water to the inhabitants of the city of Peoria, and reserving to the said city of Peoria the right to purchase the said waterworks system, after its enlargement, improvement and extension, all as hereinafter provided for.'

"The said ordinance of May 4, 1889, under which as amended, complainant is operating, contains the following:

" 'Sec. 4. And the said city of Peoria hereby grants this franchise and license to the said grantees, for and during the term of thirty years from the sale and delivery of the present waterworks system, subject only to the right of purchase, and conditions herein provided, and also the right to operate the said present system of waterworks, and to enlarge, extend, improve, maintain and operate the same in, near and for the said city of Peoria for supplying the city of Peoria and its inhabitants, and those in its immediate vicinity, with water for public and private uses, and to use within the present and future limits of the city of Peoria, subject to the restrictions, limitations, and in the manner herein provided, the streets, alleys and other public ways or lands, for the purpose of laying, taking up, repairing or otherwise maintaining and operating mains, pipes, hydrants and other appurtenances.'

" 'Sec. 20. The city of Peoria reserves the right to disturb the pipes of the said grantees when it shall become necessary for building or repairing sewers, or for the making of other city improvements, the same to be so done as to cause the least damage to the grantees possible. But nothing herein shall be so construed as to release contractors with the city from liability for damage caused by disturbing said pipes. * * *'

" 'Sec. 14. The pressure, capacity and efficiency of said waterworks system shall be kept at all times during said period of thirty years fully up to the standard prescribed in this ordinance, and for the purpose of determining the amount of pressure and efficiency of said waterworks as a fire protection from time to time, the city council reserves the right to order a test of said works and pressure in any and all parts of the city of Peoria at least once each year during said period of thirty years.'

" 'Sec. 15. * * * The city of Peoria will adopt ordinances protecting the grantees in the safe and unmolested exercise of the franchise and license hereby granted. * * *'

"Some of the other provisions of the ordinance are in substance: (1) That the proposed grantees should assume the payment, according to their terms, of the $450,000 of water bonds of the city of Peoria outstanding, and that such payment should be secured by a good and sufficient first mortgage upon all the waterworks property then existing or afterwards acquired, including all improvements and betterments. On the 30th day of October, 1889, such a mortgage was executed and delivered. (2) That the grantees at all times shall furnish an adequate supply of water for city, sanitary, and fire protection purposes, and that the system shall be kept and maintained to a high standard of quality and efficiency, as prescribed by the ordinance. (3) That at the expiration of 10 years from the date of the passage of the ordinance or at any five-year period thereafter, the city of Peoria, as a municipal corporation, shall have the right to purchase the waterworks of the grantees and all things pertaining thereto, as in said ordinance provided, on certain conditions and at a valuation to be fixed by appraisers at the time of such proposed purchase.

"(3) The Central Railway Company and the Peoria & Prospect Heights Railway Company, defendants, are corporations of the state of Illinois, and at the time of filing the petition herein were operating all the street railway lines then existing in the city of Peoria and vicinity, consisting of about 43 single track miles of electric street railway, and the cars on all of the said lines were at the time aforesaid being operated by electric motive power generated

181 F.—63

in and supplied by the power station of the Central Railway Company. The original ordinance authorizing the Central Railway Company to use electricity in the propulsion of its cars was granted by the common council of the city of Peoria on the 16th day of May, 1889.

"Among other provisions this ordinance contained the following:

" 'Sec. 2. Said company shall operate said railway and propel its cars by electric motive power and not otherwise.'

" 'Sec. 22. Said Central Railway Company shall be liable for and pay to the persons, companies or corporations injured, all damages which may result from the passage of this ordinance or from carelessness, negligence or misconduct of said company or any agent or servant of said company in the operation of said railway or railways which it may build, own, lease or control.'

"Other ordinances have been passed by the common council of the city of Peoria from time to time, granting privileges, with certain qualifications, to the defendants and other street railway companies then existing in the city of Peoria, but there is no material change made by any of these ordinances, of the provisions above quoted. None of these ordinances prescribed the particular system of operating by electricity to be used by the defendant companies.

"(4) There are at present $17\,84/100$ miles of streets in the city of Peoria in which complainant's water mains are laid and on which same streets defendants' street railway lines are located and operated. Of this mileage, $15\frac{1}{2}$ miles of water mains, now constituting an important part of complainant's system, were in existence, laid in these streets before any license was granted by the city to lay street railway tracks or to operate any kind of a street railway.

"(5) The defendants, at the commencement of this action and for a considerable period of time prior thereto, were 'operating their railway lines by what is commonly known as the overhead single trolley system.' The electricity generated in the power station of the defendant Central Railway Company, and used to operate the motors under the cars, is conveyed to them by an overhead wire and a single arm or pole, attached to the car, and carrying a contact wheel which runs along and presses up underneath the overhead wire. The current passes from this wire down through the wheel and arm to and through the motors; thence to the wheels of the car, and from them to the car tracks or rails. The current then finds its way back to the generator in the power station, and, in accordance with an established law of electricity, in so doing 'follows the paths of least resistance.'

"(6) The railway tracks of defendants' railways are necessarily electrically uninsulated from, and in electrical contact with the earth, although in the business portion of the city of Peoria the streets upon which such tracks are laid are, for the most part, paved with a brick pavement laid upon a concrete foundation. A part of the returning electric current, after going through the car motors to the tracks, finds its way from the rails, through the ground, to the water pipes of the complainant, and makes use of the same as a part of its circuit back to the generator in the power station. Wherever this current (in compliance with the law above referred to) escapes from these pipes into the moist earth, it sets up a chemical action which causes a decomposition of the metal pipes that is similar to the action which takes place in an electro plating bath. This is called 'electrolysis.'

"(7) The soil in and around Peoria in which the water pipes and mains of complainant's system are laid is of a moist, sandy character, and often furnishes a path of comparatively low resistance to the electric current. Samples of soil which were taken from the immediate vicinity of complainant's service pipes show traces of lead which had been deposited there by the action of the electric current, and the metal from these water pipes is frequently found deposited in the form of some of its compounds along the path of the current from the pipe to the rails of the defendant companies.

"(8) Samples were analyzed from pits in complainant's water pipes and from the soil in the vicinity of such pipes. The materials which came from the pits in the cast iron water pipes were found to be the products of decomposition of the metal in the pipes, resulting from the defendants' electric current passing through the salts in the surrounding soil. This action produced as aforesaid, has destroyed many lead service pipes of the complainant, and

has resulted, so far, in pitting and weakening many of the pipes and mains of its water distributing system.

"(9) In the months of May and June, 1894, an extended examination of the water piping system, then in possession of the aforesaid receiver, was made by electrical experts and more than 1,000 electrical measurements taken, which showed that at that time there was in every instance a difference of potential, indicating flow of electric current between rails and pipes. This difference of potential or electrical pressure was found to vary in different cases from a fraction of a volt up to 45 volts. The measurements showed that in some places the flow of current was from the rails into the pipes, and in others from the pipes into the rails. Actual tests made at that time showed a loss of metal in single service pipes of over a pound of metal per month, the observations indicating that many other pipes were deteriorating at the same rate. Excavations were made in a number of places for the purpose of inspecting the pipes to ascertain their actual condition. Many of these pipes were found to be wasting away, and there was evidence that rapid electrolytic action was taking place.

"(10) On April 6, 1894, the receiver of the Peoria Water Company, who was in possession and operating the waterworks plant, caused notification to be made to the Central Railway Company 'that the Peoria Water Company has been for a long time past, and is now, daily suffering and sustaining great injury and damage to its lead and iron pipes and other underground property in the streets and alleys of Peoria; that it is put to great labor, expense, and trouble in making and keeping up repairs on its said pipes by reason of the improper and unlawful use by you of the ground as a return conductor for electrical currents, and by the illegal, careless, and improper use of electrical currents generated by you.' Similar notice was given to the mayor and common council of the city of Peoria on or about November 24, 1893, December 8, 1893, December 19, 1893, January 2, 1894, and on February 7, 1898, which said notices called upon the city for protection under the waterworks ordinance against damages which the notices alleged were then being suffered.

"(11) Another examination of the water piping system now owned and operated by the complainant, but then in the possession and custody of the said receiver, was made in the early part of 1898 by the same experts who made the examination in 1894. An electrical survey was made with a view to a comparison between the conditions existing in 1894 and 1898. The experts found and reported that the destruction was taking place more rapidly in 1898 than in 1894, and that it was being caused by electric currents generated by the defendants herein.

"(12) During the progress of the taking of defendants' testimony in this case, it appeared from the evidence that some of complainant's iron gate boxes were located near the rails of defendants' track, and it was contended by defendants' counsel and experts that enough current was diverted by reason of the proximity of these gate boxes to account for all the electrolysis claimed by the complainant. It was contended by complainant and its experts that in no case did any actual contact exist between the gate box and the rail except in instances while a car was passing over the box. Nevertheless, 35 of these gate boxes were taken out and replaced by vitrified tile pipe, a nonconductor of electricity. In other cases the gate boxes were entirely removed, and not replaced because not needed. This change left no gate boxes within one foot from the rails. Examination and tests made by both parties after this change in the gate boxes showed large quantities of electric current from defendants' system still traveling upon complainant's pipes.

"(13) In June, 1899, and after considerable improvement had been made by the railway companies in the way of heavier rails and better bonding, and an improved return feeder system, another electrical survey was made of the existing conditions between the rails of the railway companies and the water mains of the complainant. This survey showed that a large volume of current was still flowing between the rails of the defendants and the pipes of the complainant, the volt meter showing 10 different readings of 10 volts and over, the highest found being 35 volts, rails positive to pipes.

"(14) A difference in potential of the fraction of a volt will cause electrolysis, and from the conditions hereinabove found and stated the ultimate de-

struction of complainant's pipes by the currents of electricity allowed to escape from defendants' system is a question only of time and pressure.

"(15) The evidence discloses no known method by which the complainant by its own action can protect its water distributing system of pipes and mains from the electric currents of the defendants' single trolley railways.

"(16) The evidence discloses no complete remedy for the injury to these water pipes except the entire removal of electric current from the water mains. Such removal is impossible so long as the return currents of the electric railways are grounded or in electrical contact with the earth. The other methods which have been suggested by the defendants in this case do not in practice and cannot prevent the escape of a portion of the current into the ground and water pipes.

"(17) The defendants can prevent the injury by controlling the current generated as aforesaid by means of the use of a complete metallic circuit, insulated from the rails and ground, providing a channel for the return of the current to the generator as perfect as the channel that is provided to supply the power along the street for use. In the District of Columbia, outside of the City of Washington, the double trolley has been and is being installed by a number of roads under acts of Congress providing, in substance, that, where the overhead trolley is used, it must be the double trolley, and also that no portion of the electrical circuit shall under any circumstances be allowed to pass through the earth, and that neither pole or any dynamo furnishing power to the line shall be grounded. This action by Congress was caused by the interference of the electric current of the single trolley railways with underground metallic structure in Washington and the surrounding territory. The overhead double trolley system has been used in Cincinnati, Ohio, for 10 years, and has been shown by experience during that time to be practical, economical, and satisfactory, and the evidence shows that by its use in this case the return current might be carried back to the dynamo without coming in contact with the earth at all, and the difficulty from electrolysis thus be completely overcome. The original cost for installation of the double trolley system is considerably more than for the single trolley system. While the evidence in the record as to the exact cost of changing the defendants' system from the single to the double trolley is conflicting and unsatisfactory, it is sufficient to determine the fact that such cost would not be so unreasonable and excessive as to make it impossible for the defendants to adopt the double trolley system.

"(18) The defendants' negative return system is as good or better than the average used by overhead single trolley electric street railways in cities of the size of Peoria, and the defendants have done all that can be done under the present state of the art, so long as the single trolley is used, to care for the safe return of their electric currents. Notwithstanding this, it clearly appears from the evidence that a portion of the returning current continues to escape to complainant's piping system and necessarily causes injury, and ultimately destruction thereto.

"(19) At least 25 miles of complainant's water mains are laid under streets paved with permanent and expensive pavement, and practically no access can be had to these mains except when made necessary by actual breaks in the pipes. The fact of injury to these mains in this territory from the electric current of defendants is capable of demonstration and has been demonstrated in this case, though it is impossible to determine the exact extent of the injury to the whole system at any given time.

"(20) The ultimate facts disclosed by the evidence may be briefly summarized as follows: (1) The injury complained of exists. (2) The injury is permanent and continuing. (3) The injury has been and is being caused by the defendants. (4) The complainant can do nothing to prevent the injury. (5) The defendants can prevent it by use of the overhead double trolley system, or by any system which provides a completely insulated metallic circuit for the electric current. (6) The overhead double trolley system, though more expensive to install, has been demonstrated by use and experience to be as safe, economical, and satisfactory in its operation as the single trolley system.

"Conclusions of Law.

"(1) The court has jurisdiction over the subject-matter in this proceeding, because: (a) The suit as originally instituted by the receiver was ancillary to the main suit in which the receiver was appointed and was cognizable in the circuit court, regardless of the citizenship of the parties. (b) When the receiver turned over possession of the property to the Peoria Waterworks Company, as assignee of the purchasers, that corporation was properly substituted as complainant in the petition in place of the receiver, because it then had both the custody and title to the property and was a citizen of New Jersey, while the defendants were citizens of Illinois, and the cause of action remained the same.

"(2) The court has jurisdiction over the parties to this proceeding because the citizenship is sufficient, and the defendants, by coming into the Northern Division of the District and answering the petition filed there, without objecting to the jurisdiction over the person, have consented to be sued in that division of the district, and objection which might have been made on that ground is waived by consent.

"(3) In Illinois there is vested in municipal corporations the power of exclusive control over the streets, and in many cases a fee-simple title to the streets, and, under the power of exclusive control over the streets, it is well settled by the decisions of the state courts that the municipal authorities may do anything with or allow any use of streets, which is not incompatible with the ends for which they are established, and that use for the purpose of water pipes is among those for which the use of streets may be granted, and that the laying of water pipes under ground is much less of an obstruction and interference with the ordinary purposes of a street than the laying and maintaining of a railway track upon its surface.

"(4) In view of the law of Illinois relating to the use of streets, which has become a 'rule of property' and therefore will be followed by the federal courts, it cannot be held that the use of the streets for water pipes is in any sense subservient to the use for electric street railway purposes, assuming that both uses have been granted by the municipality in the proper exercise of its authority.

"(5) Both parties to this suit acquired their rights in the streets by a grant under statutory authority from the city of Peoria by ordinance passed by the common council. Each occupies the streets by legal authority. Each is performing a duty to the public, and each is compelled, under the ordinance of the city and the law, to serve the public. Each has money and property invested in its system and plant, a considerable portion of which in each case occupies the streets by such legal authority. Both are entitled to the equal protection of the laws against the invasion of their rights and property by others.

"(6) The injury which is being done to complainant's water pipes by the defendants' currents of electricity is not a mere incidental injury or inconvenience, but is a permanent, continuing injury to a legal right, which will, in effect, if the injury is permitted to go on, ultimately result in the absolute destruction of complainant's plant and property. This would amount to nothing less than the taking away from complainant of the use of its property by the defendant street railway companies which, if it be done under their license from the city, authorizing them to propel their cars by electric motive power, would be a taking of private property for public use. The Constitution of Illinois provides that 'private property shall not be taken or damaged for public use without just compensation.'

"(7) The license from the city of Peoria to the defendants, while it grants the right to them to lay their tracks and 'propel their cars by electric motive power' does not assume to give the 'right' to so construct or operate their systems as to damage the property of others who have equal rights to the use and enjoyment of their own property. A fortiori, this is true because of the fact that it is possible for the defendants to so construct and operate their railways by electric motive power as not to interfere with or injure the water pipes of the complainant. But, even if such license did not assume to grant the 'right' to operate in the manner in which the defendants are operating, re-

gardless of injury to others, the law would not tolerate such use because of the provisions of the Constitution above quoted.

"(8) The injury complained of in this case, is the direct and immediate result of defendants' acts—as much so as if the defendants were to deliberately uncover and destroy by any other means, the water pipes of complainant. The defendants, by taking the necessary, reasonable precautions in operating their railways, would be able to avoid the injury, and, this being true, their failure to take such precautions, must be considered as negligence. It is as much the duty of the defendants, then, to refrain from injuring the property of the complainant by the one method as it is by the other. The complainant is as much entitled to protection against the injury from defendants' electric currents negligently allowed to stray upon its property, as it would be to protection from the wanton destruction of its property by any other direct means which might be employed by the defendants. The maxim "Sic utere tuo ut alienum non lædas" applies even under the strictest limitations of the rule which have ever been applied by the courts in any case.

"(9) Although the defendants are operating their railways under ordinances from the city, granting them a license to propel cars by electric motive power, and in so doing are interfering with the property and water pipes of complainant, such interference and injury is not damnum absque injuria because: (1) It is possible for ·the defendants to so operate their railways by electric motive power as not to injure the complainant's property. (2) It is impossible by any known method for the complainant to protect its property from such injury. (3) Where there are two methods of accomplishing a legal result and one method will work an injury to another and the other method will not, it is the duty of the person doing the thing to use that method which will not result in injury to such other person. (4) The failure on the part of the defendants to observe such duty constitutes negligence, and, when it results in damage to another, such damage is actionable.

"(10) The injury found to be going on in this case is the direct consequence of the unnecessary and wrongful acts of the defendants in accomplishing a legal result—that is, the propulsion of cars—and, unless the defendants are protected by their license from the city, they are liable to the complainant for such injury. These acts, unnecessary and wrongful in themselves, are not rendered lawful by the ordinance granting the use of the streets for the purpose of propelling cars by electric motive power, and, inasmuch as they work 'hurt, inconvenience, and damage' to the complainant, they constitute a nuisance which is actionable at the suit of the injured party.

"(11) The injury complained of being actionable, there can be no doubt of the power of the court to grant some remedy. The damage already done is chargeable to the defendants, and, so far as such damage is capable of being definitely ascertained, the defendants should be held liable in a suit at law. But a suit and recovery at law would not stop the injury which is and must necessarily be continuous under existing conditions. The very life of complainant's plant and franchise is threatened. The only adequate remedy is therefore by injunction as prayed in the petition. The special master's conclusion is that the bill and evidence make a case of equitable jurisdiction, and that an injunction should be issued .as prayed, subject to such reasonable conditions as to the court may seem right."

There was a hearing on the question of jurisdiction, which was sustained, and also on the merits. The difficulty of the case and the importance of the interests involved led to a re-reference after considerable delay. On October 25, 1907, the case was recommitted to the same master. By the first reference, made May 26, 1898, the master was directed to take evidence and report the same to the court, together with his conclusions. By the second order a like direction is given, and he is directed to hear and consider further evidence on the following points :

(a) What remedies can be applied to substantially minimize or prevent the injury, if any, to complainant's water distributing mains and

system in and near the city of Peoria, Ill., by the return electrical currents employed by the defendant in the operation of its street railway lines in said city?

(b) The relative merits of the single overhead trolley system and insulated circuit systems of operating street railways, with relation to the leakage of electrical current, and the resulting injury to the underground metallic structures of other public service corporations or in any other respect material to the issues herein, as shown by the results of experience or otherwise, since the closing of the proofs in this case.

(c) What are the means now employed by the defendant herein to prevent injury to the underground metallic structures in the streets of Peoria by the return electrical current of the defendant, and the results of the means so employed.

(d) To what extent, if any, have the distributing mains of the complainant company located in the public highways in the city of Peoria been injured or destroyed by the return current of the defendant company, so far as shown by examinations made, or anything occurring or ascertained since the closing of the proofs in this case before the Special Master.

(e) What improvements, if any, have been made by the defendant herein in its electrical return system since the close of defendant's evidence, on the former hearing before said Special Master?

Evidence under the second reference was taken in March and April, 1908, and the master made his report June 1, 1909, as follows:

"First. Points 'c' and 'd.' In March, 1908, the defendant was operating about 50 single track miles of railway lines in the city of Peoria and vicinity. The rails in use were largely of the girder type, 7 inches high, 60 feet long, and weighing 80 pounds per lineal yard. On the streets in the business parts of Peoria these rails were laid on hardwood ties, the latter embedded in concrete, and the space between the rails and between the tracks paved with a hard, vitrified brick, set on edge so as to bring the surface of such pavement even with the top of the rails, the portion of the street adjoining said tracks being also paved with like material and in a similar manner. Defendant's return system at the same time consisted of its rails, bonded at each rail joint with two no. copper wires, in a manner commonly known as the 'channel pin bond.' At the time above specified the defendant was engaged in the application to the rail joints of its system of 'the brazed bond,' and in March, 1908, the latter had been applied to the rail joints of about three miles of track. This brazed bond, according to the evidence, is one of the most efficient devices for continuing the electrical conductivity of the rail return at the rail joints, but is no more efficient in that respect than the welded joint, or certain other methods of bonding, which have been in use for a long time. Where special work existed in the track construction, the rails and tracks were cross-bonded. The defendant also had as a part of such return system about six miles of negative overhead return wires running from its power generating station to different parts of the system, these negative returns at the terminals being connected with rail and tracks, and at the power station with the negative bus-bar of the dynamo. A considerable portion of this work had been done since the close of defendant's evidence on the former hearing, and is in the nature of an improvement to the conductivity of the return system in the way of heavier rails, double rail bonds, cross-bonding, additional negative return feeders, and, so far as had been applied, the brazed bond; but during the same period the average load on defendant's system had been largely increased, probably doubled, and, owing to this increase, and the fact that the large interurban cars are being run over some of the tracks in Peoria, it is more difficult to prevent the escape of electric current to the water pipes of complainant.

While the principal purpose of such improvement has been to prevent the escape of the current from defendant's system, the evidence shows that notwithstanding the means so employed the current flow upon complainant's system has gradually increased, a portion of the current has continued to escape and work damage and injury to the proximate underground metallic structures, especially to the complainant's water pipes.

"Second. Point 'd.' Since the closing of proofs on the former hearing, the complainant's distributing mains in many instances have been injured, and in some rendered useless, by the return current of the defendant company. In these distributing mains since 1893 there have been discovered joint leaks in the 30-inch mains, 119; in the 20-inch mains, 4; in the 16-inch mains, 43; in other mains, 47. Two breaks have occurred in the 30-inch mains and 9 in the 20-inch mains. Electrical surveys made as late as March 25, 1908, showed the most current flowing on the pipes in about the places where the greatest number of joint leaks and breaks occurred. The pittings in the mains caused by flow of current from defendant's system have been constantly increasing in depth. On South Adams street, where the depth of the pitting, according to the evidence under the former reference, was $\frac{1}{8}$ of an inch, in March, 1908, instances were found where the depth of pitting was $55/100$ of an inch in a main, the total thickness of which is $\frac{7}{8}$ of an inch. The evidence appears conclusive that these pittings, leaks, and breaks have been largely caused by the electric current escaping from the defendant's railway system.

"Third. Point 'b.' No competent, direct evidence was offered by either party on said question.

"Fourth. Point 'a.' The defendant offered witnesses who testified, in substance, that 'all danger of injury' to complainant's water mains and system from electrical currents generated by defendant in the operation of its street railway could be prevented by the use of the brazed bond on all rail joints in addition to the present bonding, together with proper cross-bonding and 'jumpers,' thoroughly connecting all rails with each other, in all special work, and proper maintenance of overhead negative return wires as described in said testimony. Some of these same witnesses, also, on cross-examination, testified, in effect, that the plan proposed would not, and could not, wholly prevent the escape of electric current from defendant's system to the water system of complainant, but that the portion of the current that would still leave the rails would be so small and so distributed along complainant's system as to do no damage on leaving the pipes. Complainant's witnesses testified in effect that the plan proposed as aforesaid would not prevent the escape of some current and could not prevent the injury, and that any amount of electric current flowing upon and off the water pipes will cause injury where it leaves the pipe through moist soil, and that such injury is directly proportional to the amount of current flowing during any given period, and this proposition is established by a large preponderance of all the evidence.

"Fifth. The evidence offered on this re-reference, and herewith reported, as aforesaid, fails to disclose any method which will completely or substantially prevent the injury complained of, and all the evidence fails to disclose the discovery, since the hearing under the previous order of reference of any new principle or fundamental law regarding the nature and effect of electric currents or of any new method of preventing the escape of such current different in principle from those known at the time of the former hearing. In other words, the evidence on this reference, taken as a whole, tends to confirm the findings and conclusions stated in this special master's former report, numbered 14, 15, and 16, which are as follows:

" '(14) A difference in potential of the fraction of a volt may cause electrolysis, and from the conditions hereinabove found and stated the ultimate destruction of complainant's pipes by the currents of electricity allowed to escape from defendant's system is a question only of time and pressure.

" '(15) The evidence discloses no known method by which the complainant by its own action can protect its water distributing system of pipes and mains from the electric currents of the defendant's single trolley railways.

" '(16) The evidence discloses no complete remedy for the injury to these water pipes, except the entire removal of electric current from the water mains. Such removal is impossible so long as the return currents of the electric rail-

way are grounded or in electrical contact with the earth. The other methods which have been suggested by the defendants in this case do not in practice, and cannot, prevent the escape of a portion of the current into the ground and water pipes.'

"The master finds and concludes that all the evidence offered on the present reference fails to disclose any sufficient ground for changing or reversing the aforesaid conclusions."

A definition of some of the terms used by the expert witnesses and by the master in his report is necessary to clearness of discussion.

The "C. G. S. system." Units of electrical force and volume have been fixed by law with reference to what is known as the "centimeter-gram-second system," generally referred to as "C. G. S." This system was adopted with reference to length, expressed by the centimeter of $^{39}/_{100}$ inches, mass, expressed by the gram, weighing about $15\frac{1}{2}$ grains avoirdupois, and time, expressed by the second. These are the fundamental units of scientific work. Thus the unit of force is that which, when acting on a body weighing one gram, will accelerate that body one centimeter in one second. All electrical measurements are based solely on this force unit, and the electrical units of force, resistance, and volume have been defined by Congress with reference to the C. G. S. system. The unit of resistance, called the "ohm," is 1,000,-000,000 units of the C. G. S. system. The unit of volume, called the "ampere," is one-tenth unit of the C. G. S. system. The unit of pressure, called the "volt," is that electrical force which, when steadily applied to a wire or other conductor having a resistance of 1,000,000,-000 units of the C. G. S. system, will produce a current of one-tenth of a unit per second of that system. And the unit of power, called the "watt," equals 10,000,000 units of power in the C. G. S. system, or one ampere times one volt.

"Potential, volt." For practical purposes, it may be said that a dynamo generates electricity and sends it out over the lighting wire or trolley wire at a pressure represented by that number of volts indicated by the work done by the lights or street cars, expressed in watts, kilowatts (1,000 watts), or watt hours, where the work continues one or more hours. One horse power is 746 watts or $\frac{3}{4}$ kilowatts. Volts multiplied by amperes give watts. Thus 110 volts on a lighting wire carrying one-half ampere of volume create a power of 55 watts. The greater pressure which sends the current out on the circuit over the trolley wire and back through the rails, ground, and water pipes to the dynamo is known as "potential," which may be likened to a head of water in a dam. When the current is leaving the rails and moving into the earth and upon the pipes, the rails are said to be positive to earth and pipes; and, when the current moves from the pipes to the rails, the former are positive to the latter. All the battery or dynamo does is to create a difference of potential, or difference of electrical pressure, between two points in an electrical circuit. The unit of that pressure is the volt, equal to the number of units mentioned.

"Electrolysis" is the decomposition of a metal solution in water, liquid ammonia, etc., accompanied by decomposition of the water into oxygen and hydrogen, or of a mass of molten metal, by having an electric current passed through it. The metals, carbon, and pure sub-

stances generally conduct electricity without any decomposition whatever, except at elevated temperatures. The solution or melted mass is known as an "electrolyte." The current is introduced to and taken from the electrolyte by means of strips or portions of metal or carbon called "electrodes," connected with wires forming part of the electrical circuit; that by which the current enters being known as the "anode," and the other as the "cathode." In the process of electrolysis minute portions of the metal in solution, and sometimes of the metal in the anode, together with the hydrogen, are deposited upon the cathode, as in silver platings. The oxygen goes to the anode, and tends to oxydize it. The anode is sometimes decomposed in the process, and sometimes not, depending on its composition and that of the solution. As applied to water pipes, electrolysis is the stripping off of small particles of the iron when a suitable electrolytic solution is present, leaving the carbon of which the pipe is partly composed intact. What the cathode is in this process of decomposition does not clearly appear, but it may be assumed to be the adjoining water pipe, a gas pipe, lead water-service pipe, street car rail, or some metallic deposit in the soil; one or more of these being part of the circuit of the current operating on the water main, and flowing toward the negative side of the dynamo in the railway power station. Pure water, being a nonconductor of electricity, cannot be an electrolyte, but readily becomes such when a portion of metal is dissolved in it, as copper sulphate (blue vitriol), zinc sulphate, silver nitrate, iron oxide (rust), etc. The breaking up of the water into hydrogen and oxygen at once introduces a new resistence to the current, tending to put an immediate end to electrolysis. This resistance, known as "polarization," may be overcome in a variety of ways, among others by applying a higher voltage or potential or by an alternating current. The oxygen going to the water pipe from which the current is passing oxidizes or rusts the pipe, and the coating of rust acts as an insulator, tending to prevent further corrosion of the pipe at that point.

Complainant's contentions are as follows: Defendant is using the water mains and service pipes as a part of its negative return system, inducing electrolysis or chemical decomposition of mains and pipes. Owing to the necessarily jointed construction of the mains, being connected by lead joints forming an imperfect electrical connection between the pipes, electrolysis results by the passage of a current through the wet earth around each joint; the "anode" joint being injured. Similar damage is claimed to result at those places on the pipe where the current leaves it to pass to other underground structures or back to the railroad track; and also upon the lead service pipes of complainant. It is further claimed that the smallest fraction of a volt difference in pressure or potential on the pipes will cause their gradual decomposition and destruction. It is alleged, and found by the master, that the ultimate destruction of complainants' system is only a question of time and pressure, under present conditions; that complainant can do nothing to lessen the injury while it is feasible for defendant by putting in an insulated metallic circuit by means of the double trolley or otherwise to entirely prevent the escape of current from its circuit.

Defendant has objected to the jurisdiction, not by plea, demurrer, or motion, but by answer alleging that, when the bill was filed by the receiver, he had no interest in the property, it being then owned by the purchasers at the foreclosure sale. On the merits it contends as follows: By the ordinance recited in the master's report, it is required to operate the plant by the single overhead trolley system, and it cannot therefore be required by the court to install another system. As found by the master, defendant has done everything possible for the safe return of current, in the present state of the art, so long as the single trolley is used. Defendant's acts are claimed to be authorized by legislative authority, and, even though incidental injury be done to the water system, it is damnum absque injuria; nor is the evidence, it is argued, or master's report, sufficient to justify an injunction against operation without an insulated circuit. It is further insisted, even if serious injury is being done to the water pipes, that the remedy suggested calls for the exercise of the police power for protection of the public safety to be applied only by the legislature or city council, and not by the court. In other words, the court can exercise only judicial, not legislative, functions. Generally it is contended that the running of street railroads by electricity is practically in its infancy. New discoveries are being constantly made. Injury by electrolysis is not clearly understood, nor rationally capable of explanation, in the present state of scientific knowledge. Experts are changing their views in respect to the alleged danger of injury. The attitude of municipal authorities has been one of waiting and experiment. Some 1,600 single trolley systems exist in the United States, and only 1 or 2 double trolley systems. The injury in Peoria is not one general to the whole piping system, but is localized to the region near the power station; and the damage is growing continuously less and less by better methods of negative return all over the country, and particularly in Peoria. There is no great or irreparable injury, it is said, sufficient to justify the restraining of the public service of carrying passengers in defendant's cars, except on conditions of installing the double trolley, or other insulated system; further, that the installation of the double trolley is unreasonably expensive, and its use is dangerous, nor will it entirely prevent the escape of electric current into the ground, and upon the water pipes, so as to cause injury.

At the outset it may be said that the court has no power to prescribe by injunction the use of any particular system of circuit or negative return. It is doubtful, indeed, whether the judicial power would extend to the making of a decree restraining the defendant from continuing to serve the public unless it shall cease injuring complainants' water system. The utmost possible relief is to restrain defendant from continuing the injury, assuming for the present that sufficient damage is shown, and punishing it and its officers for contempt in case of disobedience, leaving the means of curing the injury entirely to its discretion. In case of such a result, a decree might be rendered in contempt proceedings brought in this suit on the equitable side, awarding compensation for such injury as might be shown, with incidental punishment. Or a proceeding for a criminal contempt might be brought in case of deliberate disobedience in which a fine or imprisonment

might be imposed. Bessette v. Conkey Co., 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997. That no specific system can be imposed by the court is settled by general decisions, passing on the essential distinctions between legislative and judicial power. "A court of chancery is not, any more than is a court of law, clothed with legislative power. It may enforce, in its own appropriate way, the specific performance of an existing legal obligation arising out of contract, law, or usage, but it cannot create the obligation." Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 682, 4 Sup. Ct. 192, 28 L. Ed. 297, cited in W. U. Tel. Co. v. Myatt (C. C.) 98 Fed. 335, 343. "In this way, it seems to us, the court has made an arrangement for the business intercourse of these companies (express and railway), such as, in its opinion, they ought to have made for themselves. The regulation of matters of this kind is legislative in its character, not judicial." Express Cases, 117 U. S. 1, 6 Sup. Ct. 628, 29 L. Ed. 791. "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts, and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future, and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind." Justice Holmes in Prentis v. Atlantic Coast Line, 211 U. S. 210, 226, 29 Sup. Ct. 68, 53 L. Ed. 150. The reasonableness or propriety of the means to be adopted by electric railroads to prevent or lessen injury to gas pipes, water pipes, etc., is essentially an administrative inquiry, legislative in its nature when considered and administered by the Legislature, city council, or public service commission, administrative when considered and applied by the corporation itself. Spring Valley W. Co. v. San Francisco (C. C.) 165 Fed. 667, 678. And in Dayton v. City R. Co., 12 Ohio Dec. 258, affirmed on appeal 16 Ohio Cir. Dec. 736, the same rule was substantially applied. Cumberland T. & T. Co. v. United Elec. R. Co. (C. C.) 42 Fed. 273, 12 L. R. A. 544, seems opposed to this view of the law.

The whole duty of defendant is to make the damage as little as possible by using the best means reasonably within its power, the selection of such means to be left to its discretion, and at its peril of failure to exercise such discretion in a fair, bona fide way. The master reported that the injury is continuous, permanent, and constantly increasing by reason of increased traffic, extension of the railway line, and the running of heavier cars, including interurban cars, and that the ultimate destruction of the water pipes is inevitable; that a difference of potential of the fraction of a volt may cause electrolysis; that there is no complete remedy except the entire removal of electric current from the water mains, and no method except an insulated circuit will prevent the escape of a portion of the current into the ground and water pipes. Exceptions to these conclusions have been filed, and are now presented for approval or modification.

Damage to the water pipes by electrolysis in Peoria is inferred by the witnesses from the conditions found to exist on examination of the pipe, and is described in the testimony substantially as follows:

In order that electric power may be available for use, there must be a circuit. In the case of the telephone and telegraph, requiring only a small degree of force, the circuit is made up of the wires and the earth. An electric railway, requiring much greater power, must have a metallic circuit. This consists, in the single trolley system, of the trolley wire, trolley pole, motor, car wheels and rails, the last called the "return" or "negative" part of the circuit. In the double trolley system, used in Cincinnati, and to some extent in the District of Columbia, the circuit consists of two wires, and insulation between motor and rails, so that the current is theoretically prevented from reaching the rails at all. In the underground system, used in the cities of New York and Washington, the positive and negative wires are inclosed in an underground circuit. There are about 1,600 single trolley plants in the United States, and 1 or 2 double trolley systems. The same amount of electrical power (not the same electricity), measured in amperes, must get back to the dynamo as is generated by it. The rails, although having greater conductivity than the trolley wire, not being insulated because laid in the earth, or in concrete (a better electrical conductor than earth), and often being imperfectly bonded or joined at their ends, offer considerable resistance to the return current flow. A single rail offers much less resistance to the current than the wire which supplies the current to the trolley. Although the earth offers immense resistance to the electrical current as compared with the rails, yet it is impossible to prevent the escape of some portion of the current into the earth, especially when it is wet, from which it is attracted by the water pipes or gas pipes in the same or adjoining streets. From the pipes the current tends to return through the earth to the negative side of the dynamo, either by ordinary conduction or by electrolysis when the requisite conditions exist. It is, indeed, stated by some of the expert witnesses that wherever the current leaves a pipe electrolysis occurs, stripping off small particles of the pipe metal, and gradually destroying it, in direct proportion to the amperage, or volume of current flowing on the pipe. But under all the testimony, and from common observation, it is clear that the mere passage of electricity from one substance to another is not electrolysis; the metals being conductors, without decomposition, and is not necessarily attended with injury at the point of escape. Mr. Waterman, an experienced electrical and railway engineer, testified that the water around a pipe will carry electricity either conductively, without damage or decomposition, or electrolytically, with injury to the pipe and decomposition of the solution; also, that there may be electrolysis of the solution without injury to the pipe. Prof. D. C. Jackson, who has made a thorough study of the practical side of electrolysis to water mains for many years, and is a most accomplished electrical engineer, says that if the anode is crude copper, containing also iron and silver, only the copper may be carried to the cathode, while the iron and silver may go to the bottom of the tank. This illustrates the position sustained by the evidence as a whole, that electrolysis is a question of surrounding conditions, and that current leaving a pipe may or may not be attended with injury to the pipe. Prof. Jackson's experiments tend to show that cast iron and lead plates embedded in moist earth

will suffer electrolysis when a current is applied. But he did not cover the plates with scilica, asphalt, or other insulator, nor does he state current volume or voltage. He did not make any test with pieces of pipe covered with iron rust, which is an insulating protector. It is inferable from the evidence as a whole that wet earth, surrounding a water pipe, may, by containing some solution not described, possibly iron, iron rust, common salt, sulphate of zinc, nitrate of soda or carbonate of lime become an electrolyte, decomposable by having an electric current pass through it; and also, under some conditions not described, and apparently unknown, particles of the iron pipe or anode may be stripped off and pass into the electrolyte solution, or possibly be carried over to some unknown cathode, as in the process of silver plating. Analysis of samples of soil taken from two places above a water main showed from 2½ to 3⅓ per cent. of iron, and ½ per cent. to 1 per cent. of soluble salts, composed of sodium chloride, potassium nitrate, lime, and a small amount of sulphates. The testimony shows that one ampere constantly leaving a pipe for 18 hours a day under electrolytic conditions will take away 15 pounds of iron per annum. Yet in 8½ years not a single break in a water main occurred, although the rails were at that time very poorly bonded. Prof. Jackson during this peroid found a volume of 75 amperes on some of the water mains.

Injury to the ends of water pipes, near the joint, may also result from the current flowing from one pipe to another. The pieces of pipe are 12 feet long, and are covered with a nonconducting coating. It is not convenient to so join the pipe sections as to obtain a complete metallic contact between them, on account of the coating, and the oakum and lead used in the joints. Oakum is not a good conductor, and the lead, while a good conductor, is not put into electrical contact with the cast iron of the pipe, though preventing leakage of water. As a result there is a break in the conductivity of the pipe every 12 feet. However, the joint resistance is very much less than the soil resistance around the main, as well as of the water in it, pure water being nearly a nonconductor, although absolutely pure water has probably never been produced. It follows, therefore, that the current will take the path of least resistance through the joints, rather than the path of much higher resistance around them, unless an electrolyte is found near the joint, or in the water in the pipes, of such a character as to divert the current from its natural path. Complainants' witness Maury, speaking of a volume of 50 to 100 amperes, says:

"If it left the pipe to flow along the conductor connection to the pipe, it would not necessarily injure the pipe at the point of leaving. If it left to flow through the electrolyte, it would cause very serious injury."

Another witness testifies:

"It is generally accepted that the current has to leave the pipe by a nonconductor path to produce injury."

Another, speaking of electrolysis, says:

"There must be an electrolyte. If the pipe was in dry, sandy soil, conditions would be entirely different."

When this shunting will occur, or how often, no one knows. Many of the witnesses say that the joint resistance becomes so great that the

current will shunt around the joint through the outside earth, or the water in the pipe, and that, when it leaves the pipe, it causes injury. It appears that most of the joints must make a high resistance. If the current were shunted around these joints, and invariably resulted in injury to the pipe, it would not take long to destroy the whole water system. In many years there was not a single break in a water main from electrolysis. During the same period only 88 out of 5,000 service pipes were destroyed by it. Out of 9,000 service pipes there were 12 breaks in 1905, 8 in 1906, 5 in 1907, and 2 in the first four months of 1908. During the same four months there were 2 joint leaks, 4 in 1907, 12 in 1906, 7 in 1905, 9 in 1904, and 14 in 1903. As a result of three tests at different places of a large number of pipes, made in 1903, 1904, and 1906, the percentage of pipe damage was found to be 20 in 1903, 15 in 1904, and 10 in 1906. The same test showed the average current in the water pipes in 1903 5½ amperes, 4 in 1904, and 6 in 1906, and a test in 1908 showed an average of 24. These tests were by no means universal of the system, and should not be given any undue weight. But they tend to show a progressively lessening average damage. In particular places, especially near the power station, steadily increasing damage by electrolysis appears, but on the average the evidence shows it is lessening. One reason for improvement is better bonding of rails, and more attention to negative return feeders. Another seems to be that as electrolysis proceeds, and the pipes become rusted, the oxide formed increases the electrical resistance of the pipe coating, and thus prevents further electrolysis except under unusual conditions. Mr. Herrick, who testified at great length on both references, and whose testimony will be again referred to in connection with different systems of return, testified that while in case of lead pipes electrolysis carries sulphate or carbonate of lead into adjacent soil, and thus lessens the electrical resistance, yet in the case of iron pipes the resistance is increased by the iron decomposition in the soil. The oxide surface formed on water pipes by current flow diminishes subsequent chemical action by current leaving such surface. This is corroborated by some other witnesses. Tests made by Mr. Herrick in Peoria showed a constant rise in resistance as current continues to flow from the pipes, with some variation depending on moisture. A thin surface is formed protecting the pipe from further action, because the current is prevented from passing through the adjacent electrolyte. It seems, also, that the decomposition of the water in the electrolyte sets up a great resistance to further electrolysis, and tends to stop it. The proof as a whole conclusively shows that no dependence whatever is to be placed upon the numerous general statements of the expert witnesses to the effect that wherever current leaves a pipe injury occurs. With an increasing current there is found diminishing damage. These experts have entirely failed to harmonize the undisputed facts shown by actual inspection of pipes and actual tests of current flow with their theories of decomposition of metallic substances in the earth by electrolysis attended by decomposition of the pipes themselves.

Especially unsatisfactory is the theory of complainants' witnesses adopted by the master that the smallest amount of current may cause

injury; that "a difference in potential of a fraction of a volt may cause electrolysis." As a laboratory theory this sometimes is true, and sometimes not, but, as applied to a general system of water pipes, it is utterly untrustworthy. The inference is made by some of the witnesses because a small pressure is sometimes found on a pipe showing small damage, made at some other time, and by some other pressure, both absolutely unknown. One witness made a laboratory test by passing $1/100$ of an ampere under pressure of $1/8$ volt through an electrolyte of sulphate of zinc, similar to solutions in the earth, and with zinc electrodes, and got electrolysis of the zinc anode. Whether cast iron electrodes covered with insulating material, like that used on water pipes or pieces of oxidized iron would have given a like result he does not state. Again, it is not explained how or why the weak current on the pipe does not pass through the joint rather than seek a path through a weak electrolyte near by. While this theory finds some little support in the evidence, it is so inconsistent with established facts as to leave the finding without any sufficient foundation. Mr. Waterman says that an iron anode is not always corroded by the escaping current even when the electrolyte is itself split up, and that the silicon found on the water pipes will prevent corrosion; and he concludes that it is impossible to tell what amount of current it is safe to draw per square foot from the surface of a pipe. Defendant's experts generally agree that a small amount of current is not injurious. Complainants' witnesses are convinced to the contrary, and the master has followed them; but the finding is quite unsatisfactory, and so inconsistent with the nature of electrolytic action, and with the facts clearly established by undisputed evidence as to actual damage, that it cannot be sustained. It is also inconsistent with the theory of increased resistance due to water decomposition in electrolysis.

Lead service pipes have also to some extent been injured by electrolysis, especially near the power station. Altogether there are about 9,000 of them. During the 19 years, from 1890 to 1909, there have been 217 breaks in service pipes attributed to electrolysis, and many more from other causes. From electrolysis there were 12 breaks of service pipes in 1905, 8 in 1906, 5 in 1907, and 2 in the first five months of 1908. These service pipes are many of them under the street railroad tracks, and the theory of damage is that when the iron pipes are positive to the rails the current flows from the mains through the lead pipes, and then through some electrolyte in the earth to the rails, decomposing the service pipe as it goes. This injury, like that to the mains, is shown to be lessening, and the percentage of damage is not enough to show danger of the ultimate destruction of these lead pipes, even of those in the region of the power station where almost all the breaks have occurred. Repairs to service pipes are paid for by the water consumer. It may be that the use of galvanized iron service pipes instead of lead, near the power station, might be an improvement, but this will be left to the judgment of complainant.

Complainants' waterworks system is being damaged by electrolysis caused by electricity generated by defendant, but not so seriously as reported by the master. This injury should be stopped. Complainant cannot in the present state of development find any reasonably

practical way to cure it. Both parties insist that the injury is curable, but they differ as to means. The subject has been most seriously studied by many engineers, and there is a difference of opinion among them whether anything short of a metallic circuit will be a complete remedy. Many other plans have been tried. The effort has been to so protect the rail return as to prevent escape of current into the earth. No claim is made that this can be fully done, but some 11 witnesses testified on the second reference that the rails can be so bonded and cross-bonded as to practically stop electrolysis of the water pipes, with the assistance of other means of negative return. Nearly as many other witnesses are of opinion that no such thing is possible, and the master agrees with them, and has recommended the compulsory installation of a metallic, nonrail return circuit.

Four plans of improving the rail return are explained by defendant's witnesses, which they think practically efficient. They have been used more or less since 1899. All of them contemplate the use of the brazed rail bond, of which defendant had installed about six miles at the time the testimony was closed on the second reference. This bond consists of a number of leaves of thin copper folded back and forth on themselves, with a piece of brass wound around the end, and applied to the side of the ball of the rail near the end. The rail is first ground with an emery wheel to make it clean and bright. Then the end of the bond is clamped between a carbon plug and the rail, and subjected to a current of 2,000 amperes passed through bond and joint until the brass melts and flows upon the clean rail surface, thus making a perfect and permanent electrical contact. Each bond is equivalent in conductivity to three feet of rail—that is, to one-fourth as great a conductivity as that of a continuous rail—and each has a greater conductivity than the trolley wire.

The first plan consists in the use of some efficient form of rail return, as the brazed bond, welded joint, etc., with cross-wires between rails and assisting the return by feeder wires from rail to negative side of dynamo at regular distances from the power house. This is the system now in use in Peoria. The second plan is called the "quadrilateral" or "constant potential system" and is simply a modification of the first, with additional bonding at crossings and switches. This system is recommended for Peoria by defendant's witnesses, with a possible addition suggested by Mr. Winters. It was called "quadrilateral" because of its supposed application to the case of a railway surrounding the center of a city, and forming a four-sided network of rails, requiring a four-sided system of negative return copper wires from the track, and bringing them together to the negative side of the dynamo. The purpose is to reduce to a constant potential all the negative feeder points, and by extending the feeders in the shape of a fan, to equalize the pressure all over the rail system, thus preventing as much as possible the escape of current from the rails and its return to the power house. The system was installed in Richmond, Va., by Mr. Waterman, and he claims to have reduced the amperage on the water pipes from a varying current of considerable size to a max-

imum of less than one ampere. It is also being put in at Toronto The underlying idea is that the tendency to leakage of current from the rails varies as the square of the distance between feeders, so that the putting in of an additional feeder divides the distance by two and the leakage by four. In Richmond four copper wires, three-quarters of an inch in diameter, were attached at one end to the negative bus bar at the station, and at the other each to an extended network of smaller wires attached to the rails. Each system of wires extended in a different direction.

The third plan is called the "drainage system," often used to protect the sheaths of telephone cables. In this the rails and pipes are regarded as a parallel conductor system of return feeders; pipes and rails being connected by copper wire. This can only be put in when the owners of both systems are working in harmony. It is in use in Rochester, N. Y., where it is claimed to have avoided trouble from complaint of electrolysis. The testimony as to its efficiency is conflicting.

The last plan is not fully described in the proofs. By this it is sought to constantly keep the whole piping system negative to the rails, so that no current can flow from pipe to rail. This may be done by copper wire, or by a "negative booster," an additional dynamo so connected with the pipes as to produce upon them a lower potential than upon the rails.

The quadrilateral or constant potential system is recommended for Peoria by defendant's witnesses, and Mr. Winters also suggests a limited use of the drainage system in addition to the other, but thinks it would not be necessary for the protection of the pipes.

Defendant's expert witnesses agree in testifying that no system will prevent all leakage of current, but think that the quadrilateral plan will be a substantial success. Complainants' witnesses believe it to be necessary to keep all the current from the rails by the double trolley or other insulated system, and that, if any current whatever gets upon the pipes, they will be destroyed. This conclusion is not established by the evidence.

The fourteenth, sixteenth, seventeenth, and paragraphs 5 and 6 of the twentieth findings of the master on the first reference are not sustained by the proofs. The findings on the second reference need modification according to this opinion.

Defendant should be enjoined from continuing the injury to the complainants' water mains and service pipes, and should be given a reasonable time to take such measures, or put in such improvements to its negative return, as will substantially prevent injury. This should be upon condition that complainant co-operate with defendant so far as reasonable and proper in aiding it to prevent or lessen the escape of current from its rails, or in preventing the escape of current from the water pipes in such manner as to cause injury thereto. The matter of the terms of the decree in these respects, as well as the modification of the findings, will be further considered on application for decree.

As to costs, I am inclined to think that neither party should have costs as against the other, and that clerks', marshals', and master's

fees should be equally divided between the parties. Fees and expenses of witnesses, experts and engineers, and for examinations and tests, should be borne by the party calling the witness, or requesting the services.